**PURDUE PHARMA L.P., The Purdue Frederick Company, The P.F. Laboratories, Inc., The Purdue Pharma Company, Plaintiffs,**

v.

**BOEHRINGER INGELHEIM GMBH, Roxane Laboratories, Inc., Boehringer Ingelheim Corporation, Defendants.**

No. 99 Civ. 3658 (SHS).

United States District Court, S.D. New York.

May 16, 2000.

OPINION

STEIN, District Judge.

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 366

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 367

   I.   Purdue's Development of OxyContin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 367
  II.  Roxane's Development of Roxicodone SR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 367
 III.  The Purdue Patents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 368
      A.   The Parent Patent: The '331 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 368
      B.   The '912 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 369
      C.   The '042 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 369
      D.   The '295 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 370
      E.   Terminology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 370

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 370

I.   Preliminary Injunction .......................................................370

II.  Likelihood of Success on the Merits......................................371
     A.  Infringement .........................................................371
         1.  Claim Construction ...........................................371
             a.  General Principles .......................................371
             b.  $C_{max}$ and $T_{max}$: Single versus Multiple Dosing Values ..............373
             c.  Preambles to the Claims in Suit .........................376
         2.  Comparison of Roxicodone SR to the Claims in Suit .....................377
     B.  Validity ..............................................................379
         1.  General Principles ...........................................379
         2.  Anticipation by the '331 Patent .............................379
             a.  Patent "by another" Pursuant to § 102(e) .........................380
             b.  Disclosure of the Present Inventions ....................381
             c.  Correction of the '331 Inventive Entity ..................383
             d.  Prior Conception and Reduction to Practice .......................384
             e.  Merits of Anticipation by the '331 Patent..........................387
         3.  Anticipation by Example II, Formulation B, of the '598 Patent ...........387
     C.  Enforceability .......................................................390
         1.  General Principles ...........................................391
         2.  Improper Terminal Disclaimer ...............................392
         3.  Failure to Disclose the '909 Patent as Prior Art........................395
         4.  Failure to Disclose the '331 Patent as Prior Art........................396
     D.  Conclusion ..........................................................397

III. Irreparable Harm .........................................................397

IV.  Balance of Hardships .....................................................399

V.   Public Interest...........................................................399

CONCLUSION ...................................................................400

## INTRODUCTION

This case arises out of a patent dispute between pharmaceutical companies seeking to develop and market drugs designed to treat moderate to severe pain, including chronic cancer pain. On September 28, 1999, plaintiffs Purdue Pharma L.P., the Purdue Frederick Company, the P.F. Laboratories, Inc., and the Purdue Pharma Company (collectively, "Purdue") filed an amended complaint in this Court asserting one count of patent infringement against defendants Boehringer Ingelheim GmbH, Roxane Laboratories, Inc., and Boehringer Ingelheim Corporation (collectively, "Roxane"). Specifically, the amended complaint seeks declaratory and injunctive relief and damages, based on allegations that defendants' research of, development of, and plans to market the pharmaceutical product "Roxicodone SR" infringe upon Purdue's patents protecting its product "OxyContin," in violation of 35 U.S.C. §§ 284 and 285. *See* Amended Compl. ¶¶ 14–17, A–H.

One week later, defendants Boehringer Ingelheim GmbH and Roxane Laboratories, Inc. submitted a joint answer asserting a counterclaim seeking a declaration that the patents in question are invalid and unenforceable and that the Roxicodone product does not infringe upon those patents.[1] *See* Answer ¶¶ 14–62, a–d.

Contemporaneously with the commencement of this action, Purdue moved for a preliminary injunction pursuant to 35 U.S.C. § 283 and Fed.R.Civ.P. 65 barring defendants from making, using, or offering to sell Roxicodone SR pending a final reso-

---

1. By Stipulation and Order dated January 25, 2000, the counterclaim was dismissed with prejudice with respect to U.S. Patent No. 5,266,331.

lution of this action. Roxane has opposed the injunction essentially on the grounds asserted its counterclaim. A factual hearing was held from November 15 through November 18, 1999. For the reasons stated below, Purdue's motion for a preliminary injunction is granted.

## BACKGROUND

### I. Purdue's Development of OxyContin

Drugs known as opioid analgesics, which are designed to treat moderate to severe pain, have been available for several decades. Until the early 1980s, however, they were limited to immediate-release dosage forms, such as Percocet, where pain relief is given at once. Immediate-release forms had the distinct disadvantage that they controlled pain for only 4–6 hours, thereby requiring frequent repeat administration for patients experiencing chronic pain. Such frequent dosing did not permit patients to sleep through the night, and patients often failed or forgot to take their medication when required. *See* Paul D. Goldenheim Decl. ¶¶ 10–17.

In the early 1980s, a Purdue-associated company, Napp Laboratories Limited, developed a controlled release form of morphine, marketed in the United States under the name MS Contin. Although MS Contin overcame many of the difficulties associated with immediate release analgesics, it presented two disadvantages of its own: First, morphine carried the stigma of being perceived by the public as an addictive narcotic to be used only as a last resort for the terminally ill. Second, the dosage level of MS Contin required to eliminate pain effectively varied greatly from patient to patient. Consequently, the titration process—*i.e.*, the process of repeatedly adjusting the dosage level until a steady state of pain relief is achieved— took too long. *See id.* ¶¶ 18–24.

Purdue therefore looked to other opioid substances as means of narrowing the dosage range and shortening the titration process. Purdue's research indicated that oxycodone would fulfill this purpose because of its ready absorption into the bloodstream (that is, its "high oral bioavailability") coupled with its prompt elimination from the bloodstream. In December 1995, after spending several years and more than $40 million in research, development, and testing, Purdue obtained approval of its product from the Food and Drug Administration ("FDA") and began marketing its controlled release oxycodone analgesic under the name OxyContin. *See id.* ¶¶ 25–31. Through the end of 1998, Purdue has spent over $207 million marketing OxyContin in the United States. *See* Michael Friedman Decl. ¶ 33.

OxyContin, which has approximately half the dosage range of MS Contin, *see* Goldenheim Decl. ¶ 29, has proved enormously successful. Sales of OxyContin from January through August 1999 were $330 million, with total 1999 sales forecast at over $600 million. *See* Friedman Decl. ¶ 20. Sales for 2000 are presently forecast at between $925 million and $1.2 billion. *See* Transcript at 138 (testimony of Michael Friedman). As such, OxyContin represented approximately 67% of Purdue's 1999 sales, and is forecast to constitute 79% or more of Purdue's sales in 2000. *See* Friedman Decl. ¶ 83.

### II. Roxane's Development of Roxicodone SR

Roxane's research and development of Roxicodone SR has followed a similar trajectory. Prior to its research on oxycodone, Roxane had developed a controlled-release morphine product, marketed under the name Oramorph SR, that competed directly with Purdue's MS Contin. Roxane then turned to oxycodone as means of slowing absorption of the pain killer into the blood stream, in order to extend the length of time pain was relieved. Roxane filed its initial paperwork with the FDA on July 7, 1992, and thereafter began clinical studies whose results Roxane included when it filed its New Drug Application ("NDA") with the FDA on December 29, 1997. On October 26, 1998, the FDA ap-

proved the NDA for Roxicodone SR. *See* Second Decl. of Michael J. Schobelock ¶¶ 3–9.

Through September 30, 1999, Roxane has spent approximately [REDACTED] on research and development of Roxicodone SR. *See id.* ¶ 6. In addition, Roxane has spent approximately [REDACTED] during 1999 in preparation for marketing the Roxicodone product in the United States. At the time of the preliminary injunction hearing in this action, Roxane estimated that Roxicodone SR would generate approximately [REDACTED] in United States sales in the year 2000. Based on this projection, the product would constitute about [REDACTED] of total United States sales for Roxane Laboratories, Inc., which is a wholly owned subsidiary of defendant Boehringer Ingelheim Corporation. *See* John T. Swartz Decl. ¶¶ 4, 10–12.

## III. The Purdue Patents

In the course of researching and developing OxyContin, Purdue applied for and was granted a number of patents ("the Purdue patents") by the U.S. Patent and Trademark Office ("Patent Office"), three of which are asserted by Purdue as bases for finding infringement. Before discussing these patents individually, a brief explanation is in order as to the history of Purdue's patent applications.

## A. The Parent Patent: The '331 Patent

The applications for the patents implicated in this suit all derived as continuations of the application that matured into Patent No. 5,266,331 ("the '331 patent").[2] The '331 application, No. 800,549, was filed on November 27, 1991, and the patent issued on November 30, 1993. The patent names three inventors: Benjamin Oshlack, John J. Minogue, and Mark Chasin. Claim 1 of the '331 patent, although not asserted by Purdue as a basis for finding infringement, is highly relevant to Roxane's defenses against the motion for a preliminary injunction. Claim 1 of the '331 patent sets forth a controlled release oxycodone formulation with particular *in vitro* and *in vivo* dissolution properties, as follows:

A solid, controlled release, oral dosage form, the dosage form comprising an analgesically effective amount of oxycodone or a salt thereof in a matrix wherein the dissolution rate in vitro of the dosage form, when measured by the USP Paddle Method at 100 rpm at 900 ml aqueous buffer (pH between 1.6 and 7.2) at 37°C, is between 12.5% and 42.5% (by wt) oxycodone released after 1 hour,

2. It is worth explaining precisely what is meant by a "continuation":

[T]here are various types of "continuing" applications that one may file at the PTO. An applicant may file a continuation, divisional, or continuation-in-part ["CIP"] application of a prior application, all of which the PTO characterizes as "continuing" applications. In general, a continuing application is one filed during the pendency of another application which contains at least part of the disclosure of the other application and names at least one inventor in common with that application.

"Continuation" and "divisional" applications are alike in that they are both continuing applications based on the same disclosure as an earlier application. They differ, however, in what they claim. A "continuation" application claims the same invention claimed in an earlier application, although there may be some variation in the scope of the subject matter claimed. A "divisional" application, on the other hand, is one carved out of an earlier application which disclosed and claimed more than one independent invention, the result being that the divisional application claims only one or more, but not all, of the independent inventions of the earlier application. A "CIP" application is a continuing application containing a portion or all of the disclosure of an earlier application together with added matter not present in that earlier application. The term "parent" is often used to refer to the immediately preceding application upon which a continuing application claims priority; the term "original" is used to refer to the first application in a chain of continuing applications.

*Transco Prods. Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 555–56 (Fed.Cir.1994) (citations omitted).

between 25% and 55% (by wt) oxycodone released after 2 hours, between 45% and 75% (by wt) oxycodone released after 4 hours and between 55% and 85% (by wt) oxycodone released after 6 hours, the in vitro release rate being independent of pH between pH 1.6 and 7.2 and chosen such that the peak plasma level of oxycodone obtained in vivo occurs between 2 and 4 hours after administration of the dosage form.

## B. The '912 Patent

The first of the three patents in suit, Patent No. 5,549,912 ("the '912 patent"), matured from Application No. 81,302, filed on November 25, 1992, and the patent was issued on August 27, 1996. The application for the '912 patent was a "continuation-in-part" of the '331 patent application, and therefore contained a portion of the disclosure of the '331 application together with additional subject matter. The '912 patent, like the other two patents in suit, names all three inventors named in the '331 patent, plus one additional inventor, Robert F. Kaiko. Claim 2 of the '912 patent, on which Purdue relies in this suit, sets forth a controlled release oxycodone formulation with particular *in vivo* properties pertaining to blood plasma concentrations of the active ingredient, as follows:

A controlled release oxycodone formulation for oral administration to human patients, comprising from about 10 to about 40 mg oxycodone or a salt thereof, said formulation providing a mean maximum plasma concentration of oxycodone from about 6 to about 60 ng/ml from a mean of about 2 to about 4.5 hours after administration, and a mean minimum plasma concentration from about 3 to about 120 ng/ml from a mean of about 10 to about 14 hours after repeated administration every 12 hours through steady-state conditions.

## C. The '042 patent

The second of the three patents in suit, Patent No. 5,508,042 ("the '042 patent"),

matured from Application No. 467,584, filed on June 6, 1995, and was issued on April 16, 1996. The application for the '042 patent was a "divisional" of the '912 patent application, and therefore contained only one of the independent inventions claimed in the '912 application. Purdue relies on Claims 1 and 2 of the '042 patent in the present suit, both of which set forth methods of reducing the range of required dosages by administration of controlled release oxycodone formulations with particular *in vivo* properties pertaining to blood plasma concentrations of the active ingredient. Claim 1 reads as follows:

A method for reducing the range in daily dosages required to control pain in human patients, comprising administering an oral controlled release dosage formulation comprising from about 10 to about 40 mg oxycodone or a salt thereof which provides a mean maximum plasma concentration of oxycodone from about 6 to about 60 ng/ml from a mean of about 2 to about 4.5 hours after administration, and a mean minimum plasma concentration from about 3 to about 30 ng/ml from a mean of about 10 to about 14 hours after repeated administration every 12 hours through steady-state conditions.

Similarly, Claim 2 of the '042 patent reads as follows:

A method for reducing the range in daily dosages required to control pain in substantially all human patients, comprising administering an oral solid controlled release dosage formulation comprising from about 10 mg to about 160 mg oxycodone or a salt thereof which provides a mean maximum plasma concentration of oxycodone up to about 240 ng/ml from a mean of up to about 2 to about 4.5 hours after administration, and a mean minimum plasma concentration up to about 120 ng/ml from a mean of about 10 to about 14 hours after repeated administration every 12 hours through steady-state conditions.

## D. The '295 Patent

The last of the three patents in suit, Patent No. 5,656,295 ("the '295 patent"), matured from Application No. 618,344, filed on March 19, 1996, and was issued on August 12, 1997. The application for the '295 patent was a "continuation in part" of the '912 patent application, and therefore contained a portion of the disclosure of the '912 application together with additional subject matter. Claim 8 of the '295 patent, on which Purdue relies here, sets forth a method of reducing the range of required dosages by administration of controlled release oxycodone formulations with particular *in vivo* properties pertaining to blood plasma concentrations of the active ingredient, as follows:

> A method for substantially reducing the range in daily dosages required to control pain in human patients, comprising administering to a human patient an oral controlled release dosage formulation comprising from about 10 to about 160 mg· oxycodone or a salt thereof based on the hydrochloride salt which provides a mean maximum plasma concentration of oxycodone form [sic] about 6 to about 240 ng/ml from a mean of about 2 to about 4.5 hours after administration and a mean minimum plasma concentration from about 3 to about 120 ng/ml from a mean of about 10 to about 14 hours after administration every 12 hours after repeated dosing through steady-state conditions, wherein said formulation provides pain relief in said patient for at least 12 hours after administration.

## E. Terminology

The claims of the patents in suit focus on the properties exhibited by the active ingredient in the bloodstream, also known as "pharmacokinetic parameters," following administration of the claimed oxycodone formulations. The pharmacokinetic symbols are as follows: "C" is a shorthand for concentration, "T" for time, "max" for maximum, and "min" for minimum.

Therefore, "$C_{max}$" is the mean maximum blood plasma concentration exhibited by the formulation, "$T_{max}$" is the mean time at which that concentration is achieved, "$C_{min}$" is the mean minimum blood plasma concentration, and "$T_{min}$" is the mean time at which that concentration is achieved. For example, in Claim 8 of the '295 patent, $C_{max}$ is about 6 to about 240 ng/ml, $T_{max}$ is about 2 to about 4.5 hours, $C_{min}$ is about 3 to about 120 ng/ml, and $T_{min}$ about 10 to about 14 hours.

## DISCUSSION

### I. Preliminary Injunction

On substantive questions of patent law, this Court is bound by the precedents of the U.S. Court of Appeals for the Federal Circuit. *See Hybritech, Inc. v. Abbott Labs.,* 849 F.2d 1446, 1451 n. 12 (Fed.Cir.1988). The decision whether to grant or deny a preliminary injunction in the context of a patent dispute pursuant to 35 U.S.C. § 283 is committed to the discretion of the Court. *See Polymer Techs. v. Bridwell,* 103 F.3d 970, 973 (Fed.Cir.1996); *Novo Nordisk of North Am., Inc. v. Genentech, Inc.,* 77 F.3d 1364, 1367 (Fed.Cir. 1996). In addition, all findings of·fact and conclusions of law at the preliminary injunction stage are subject to change upon the ultimate trial on the merits. *See Illinois Tool Works, Inc. v. Grip–Pak, Inc.,* 906 F.2d 679, 681 (Fed.Cir.1990) (citing *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101· S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981)). .

As the moving party, Purdue carries the burden of demonstrating the propriety of a preliminary injunction, in light of the following four factors: "(1) a reasonable likelihood of success on the merits; (2) irreparable harm if the injunction were not granted; (3) the balance of the hardships and (4) the impact of the injunction on the public interest." *Polymer Techs.,* 103 F.3d at 973 (citing *Nutrition 21 v. United States,* 930 F.2d 867, 869 (Fed.Cir.1991)). "[A]nalysis of each of the four factors is generally appropriate 'for reasons of judi-

cial economy and ... appellate review,'" but with two exceptions. *Id.* (quoting *Reebok Int'l Ltd. v. J. Baker, Inc.,* 32 F.3d 1552, 1557 (Fed.Cir.1994)). First, if the moving party "clearly establishe[s] the first factor (by making a 'clear showing' of both validity and infringement), it [is] entitled to a rebuttable presumption" of irreparable harm with respect to the second factor. *Id.* (citing *Smith Int'l, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed.Cir.1983)). Second, "if the moving party fails to establish either of the first two factors," then "a trial court need not make findings concerning the third and fourth factors" before proceeding to deny the preliminary injunction. *Id.* (quoting *Reebok,* 32 F.3d at 1556).

## II.  Likelihood of Success on the Merits

■ "In order to demonstrate that it has a likelihood of success, [Purdue] must show that, in light of the presumptions and burdens that will inhere at trial on the merits, (1) it will likely prove [infringement] and (2) its infringement claim will likely withstand [Roxane's] challenges to the validity and enforceability of the ... patent[s]." *Genentech, Inc. v. Novo Nordisk, A/S,* 108 F.3d 1361, 1364 (Fed.Cir. 1997); *accord Canon Computer Sys. v. Nu–Kote Int'l. Inc.,* 134 F.3d 1085, 1088 (Fed.Cir.1998) (citing *Nutrition 21,* 930 F.2d at 869–70). In this context, the patents are accorded an initial presumption of validity and enforceability pursuant to 35 U.S.C. § 282, absent evidence to the contrary. *See New England Braiding Co. v. A.W. Chesterton Co.,* 970 F.2d 878, 882 (Fed.Cir.1992) (citing *Nutrition 21,* 930 F.2d at 869). If, however, Roxane produces evidence raising a " 'substantial question' concerning validity, enforceability, or infringement," then Purdue must produce countervailing evidence demonstrating that these defenses " 'lack[ ] substantial merit.' " *Genentech, Inc.,* 108 F.3d at 1364 (quoting *New England Braiding Co.,* 970 F.2d at 882–83).

In its opposition to the present motion, Roxane not only contests infringement but also raises two distinct defenses: First, Roxane argues that the patents in suit are invalid for lack of novelty because the alleged inventions set forth in those patents were anticipated by inventions disclosed in earlier patents. Second, Roxane argues that the patents in suit are unenforceable because of inequitable conduct committed during the prosecution of the applications for the '331 patent and the patents in suit before the Patent Office. Ultimately, Roxane will bear the burden at trial of proving each of these defenses by clear and convincing evidence. *See Oney v. Ratliff,* 182 F.3d 893, 895 (Fed.Cir.1999) (anticipation); *Elk Corp. v. GAF Bldg. Materials Corp.,* 168 F.3d 28, 30 (Fed.Cir.) (inequitable conduct), *cert. denied,* —— U.S. ——, 120 S.Ct. 178, 145 L.Ed.2d 150 (1999). Accordingly, this Court keeps this burden of proof in mind in deciding whether the defenses asserted by Roxane raise a substantial question or lack substantial merit.

### A.  Infringement

■ Analysis of a claim of literal infringement entails a two-step process. *See Personalized Media Communications, LLC v. International Trade Comm'n,* 161 F.3d 696, 702 (Fed.Cir.1998). " 'The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing.' " *Id.* (quoting *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)). The first step is a question of law, whereas the second presents a question of fact. *See id.* (citing *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1456 (Fed.Cir.1998) (en banc)).

### 1.  Claim Construction

### a.  General Principles

■ "It is well-settled that, in interpreting an asserted claim, the court should

look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996) (citing *Markman*, 52 F.3d at 979). However, the specification and the prosecution history may be employed only "to understand the language used in the claims," and not to " 'enlarge, diminish, or vary' the limitations in the claims." *Markman*, 52 F.3d at 979–80 (quoting *Goodyear Dental Vulcanite Co. v. Davis*, 102 U.S. 222, 227, 26 L.Ed. 149 (1880)).

The Court must first "look to the words of the claims themselves, both asserted and unasserted, to define the scope of the patented invention." *Vitronics*, 90 F.3d at 1582 (citing *Bell Communications Res., Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed.Cir.1995)). As this point is frequently phrased, "it is the claims that define a patented invention." *Lockwood v. American Airlines*, 107 F.3d 1565, 1570 (Fed.Cir.1997) (citing *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1571 (Fed.Cir.1988)). "The terms of a claim will be given their ordinary meaning, unless it appears that the inventor used them differently." *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1579 (Fed.Cir.1988) (citing *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed.Cir.1984)); *accord Vitronics*, 90 F.3d at 1582.

Second, the Court reviews the specification, that is, the portion of the patent that "contains a written description of the invention [enabling] one of ordinary skill in the art to make and use the invention." *Markman*, 52 F.3d at 979; *accord Vitronics*, 90 F.3d at 1582. The purpose of this review is "to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics*, 90 F.3d at 1582. Accordingly, "the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman*, 52 F.3d at 979 (citing *In re*

*Vogel*, 57 C.C.P.A. 920, 422 F.2d 438, 441 (C.C.P.A.1970)); *accord Vitronics*, 90 F.3d at 1582. The specification "is always highly relevant to the claim construction analysis" and "is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582.

"Third, the court may also consider the prosecution history of the patent, if in evidence." *Id.* (citing *Markman*, 52 F.3d at 980). The prosecution history consists of "the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." *Id.* (citing *Markman*, 52 F.3d at 980); *see also Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed.Cir.1995) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." (citing *ZMI Corp.*, 844 F.2d at 1580)).

■ If, and only if, an examination by the Court of all the intrinsic evidence fails to resolve an ambiguity in the language of the claim, the Court may in its discretion proceed to consider extrinsic evidence as to the proper resolution of the ambiguity. *See Vitronics*, 90 F.3d at 1583; *Markman*, 52 F.3d at 980–81. However, this general principle need not bar the Court from admitting extrinsic evidence simply "for the purpose of background in the technical area at issue" in cases where the court ultimately "base[s] its claim construction solely upon intrinsic evidence." *Mantech Envtl. Corp. v. Hudson Envtl. Servs.*, 152 F.3d 1368, 1373 (Fed.Cir.1998) (internal quotation marks and citation omitted). "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Where admissible for purposes of claim construction, extrinsic evidence may only be used to aid the Court's understanding of the claim, and not to vary or to contradict the terms

of the claim. *See Vitronics,* 90 F.3d at 1583; *Markman,* 52 F.3d at 981.

b. $C_{max}$ and $T_{max}$: Single versus Multiple Dosing Values

A major point of dispute with respect to claim construction is whether to interpret $C_{max}$ and $T_{max}$ with reference to single dosing studies or multiple dosing studies. In other words, the parties dispute how to interpret the ranges of values given by the claims in suit for $C_{max}$ and $T_{max}$. Roxane contends that these ranges reflect values obtained from single dosing studies—*i.e.,* studies in which test subjects are given a single dose of the oxycodone formulation and then are observed for blood plasma levels of the active ingredient. Purdue, on the other hand, contends that these ranges reflect values obtained from multiple dosing studies, that is, studies in which subjects are given repeated doses every twelve hours until reaching steady state and only then are observed for blood plasma concentrations of oxycodone.

In resolving this dispute, this Court turns first to the language of the claims themselves. Roxane notes that the claims in suit consistently define $C_{max}$ and $T_{max}$ as occurring "after administration," whereas the '912 and '042 patents define $C_{min}$ and $T_{min}$ as occurring "after repeated administration every 12 hours through steady-state conditions," and the '295 patent defines $C_{min}$ and $T_{min}$ by use of similar language. Roxane concludes that this difference in language requires that $C_{max}$ and $T_{max}$ be defined by reference to single dosing studies, and that $C_{min}$ and $T_{min}$ be interpreted to refer to multiple dosing values.

In response, Purdue asserts that the "after administration" language following $C_{max}$ and $T_{max}$ is simply shorthand for the longer "after repeated administration ..." language, which should be read as requiring multiple dosing values for all claim parameters. Roxane finds this reading untenable in light of the comma immediately following "after administration," thereby separating the descriptions of the different parameters, although Purdue notes that no such comma appears in Claim 8 of the '295 patent. *See* Levy Decl. ¶¶ 32–36; Goldenheim Decl. ¶ 102.

This Court finds the claim language ambiguous on this point. As Roxane points out, the difference in language between "after administration" and "after repeated administration ..." suggests that $C_{max}$ and $T_{max}$ should be interpreted with respect to single dosing values. On the other hand, Purdue's reading of the claims is equally plausible. For instance, if $C_{max}$ and $T_{max}$ were to refer solely to single dosing values, as Roxane contends, it would have been a simple matter for the inventors to write the relevant claim language to read "after administration of a single dose." As the language stands, however, it is unclear whether the "after administration" language encompasses single dosing values, multiple dosing values, or both types of values.

Because the claim language is ambiguous, this Court proceeds to examine the specifications of the patents in suit. Both parties agree that the specifications of the three patents are virtually identical. *See* Levy Decl. ¶ 2; Goldenheim. Decl. at p. 5 n. *. For the sake of simplicity, therefore, this Court will look to the '912 specification as emblematic of the patents in suit.

In discussing the patent specifications, the parties raise a number of points. First, Roxane notes that the dichotomy between the "after administration" language and the "after repeated administration ..." language appears consistently throughout the patent specifications. *See* '912 Patent column 2, lines 43–45; col. 3, 1. 1–9, 10–18; col. 20–22, claims 1–3, 5, 7; Levy Decl. ¶ 35. However, this Court finds that the consistent use of this same language, by itself, fails to resolve the ambiguity; such consistency simply suggests that the choice of language was intentional.

Second, Roxane points to the following paragraph appearing at column 5, lines 5–16 of the '912 specification:

In order to obtain a controlled release drug dosage form having at least a 12 hour therapeutic effect, it is usual in the pharmaceutical art to produce a formulation that gives a peak plasma level of the drug between about 4–8 hours after administration (*in a single dose study*). The present inventors have surprisingly found that, in the case of oxycodone, a peak plasma level at between 2–4.5 hours after administration gives at least 12 hours pain relief and, most surprisingly, that the pain relief obtained with such a formulation is greater than that achieved with formulations giving peak plasma levels (of oxycodone) in the normal period of up to 2 hours after administration. (emphasis added)

Here, Roxane argues that the emphasized language, "in a single dose study," indicates that $C_{max}$ and $T_{max}$ should be interpreted by reference to single dose studies and not to multiple dose studies. *See* Levy Decl. ¶ 31. But, as Purdue notes, the reference to single dose studies appears only in the first sentence of the quoted paragraph, which discusses previous formulations and specifically contrasts them against the present invention, which is mentioned only in the second sentence. *See* Goldenheim Decl. ¶ 101. This Court finds Purdue's argument persuasive and therefore finds that this paragraph fails to resolve the cited ambiguity in the claim language.

Third, Roxane highlights the fact that the '912 specification includes a number of single dose clinical studies as sources for the ranges of values stated by the claims with respect to $C_{max}$ and $T_{max}$. *See* '912 Patent, col. 13–18, 19–20 (Examples 13–17, 19); Levy Decl. ¶ 38. To explain the significance of these studies, Roxane introduced the expert testimony of Gerhard Levy, Professor of Pharmaceutics at the State University of New York at Buffalo. Levy testified that single dose clinical trials are typically used to study the *in vivo* properties of pharmaceutical products because they eliminate the error incurred in multiple dose trials when residual amounts of the product linger on from previous doses, and that single dose trials therefore provide a standard basis for comparison between products. *See* Transcript at 253–55, 288.

In rebuttal, Purdue notes that the '912 specification also includes a multiple dose clinical study as a source for values for $C_{max}$ and $T_{max}$. *See* '912 Patent, col. 18, 1. 19–43 (Ex. 18); col. 18–19 (Table 20); Figure 5; *see also* Goldenheim Decl. ¶¶ 91–94. In addition, Purdue introduced the testimony of its own Vice President of Medical and Scientific Affairs, Paul D. Goldenheim. Goldenheim testified that multiple dose clinical studies provide a standard basis for comparison between products, but acknowledged that single dose clinical studies are routinely performed as a preliminary matter in deciding whether to proceed to more difficult and more costly multiple dose clinical studies of a pharmaceutical product. *See* Goldenheim Decl. ¶ 81. As a consequence, Purdue urges, it should come as no surprise that such preliminary studies would be included in the specification, whether or not $C_{max}$ and $T_{max}$ were defined by reference to single or multiple dosing values.

This Court finds that inclusion of the single dose studies in the '912 specification is equally consistent with either Purdue's or Roxane's interpretation of the disputed claim language. Putting aside the conflict in testimony as to whether single or multiple dose studies are the standard basis of comparison between products, this Court credits Goldenheim's testimony that single dose studies would likely be included in the product specification, simply as indicative of preliminary test results, regardless of whether the claim language was written in reference to those results or to others included in the specification. Because the specification also includes multiple dose results that could just as easily constitute

the basis for interpreting the ranges of values for $C_{max}$ and $T_{max}$, this Court finds that the inclusion of single dose studies in the specification fails to resolve this ambiguity.

Fourth, Purdue points to a number of portions of the '912 specification that refer to multiple dosing situations. These passages include references to narrowing the range of daily dosages, *see* '912 Patent, col. 2, 1. 1–9, 42–45, 56–58; col. 3, 1. 34–40; references to administration of the product every twelve hours, *see id.* col. 3, 1. 37–38, 41–46, 49, 54–55; references to maximum concentration levels obtained in multiple dose studies, *see id.* col. 4, 1. 9–21; and references to facilitating the titration process, *see id.* col. 1, 1. 13–17, 23–41; col. 2, 1. 9–12; col. 3, 1. 58–63. *See generally* Goldenheim Decl. ¶¶ 95–98. On the basis of the cited passages, Purdue argues that the inventions described in the '912 specification were intended for use in multiple dosing, steady state situations, and that it would be anomalous to interpret the disputed claim language to refer exclusively to situations other than that for which the product was intended.

■ This Court finds Purdue's argument persuasive. The Federal Circuit has repeatedly emphasized that claim language is to be interpreted in light of the "fundamental purpose and significance" of the invention, *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1566–67 (Fed.Cir.1992), and in a manner "consistent with and further[ing] the purpose of the invention," *CVI/Beta Ventures, Inc. v. Tura LP,* 112 F.3d 1146, 1160 (Fed.Cir.1997), *cert. denied,* 522 U.S. 1109, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998). In the present case, the many passages from the specification cited by Purdue strongly suggest, first, that one of ordinary skill in the art would administer the oxycodone formulations described in the claims in multiple dosing, steady state situations; and second, that it was a principal purpose of the invention to facilitate the titration process by reducing

the range of daily dosages needed to provide effective pain relief across the spectrum of patients. In this light, to interpret the disputed claim language to exclude reference to multiple dose, steady state situations would simply make no sense.

In sum, the claim language in question is ambiguous as to whether the specified ranges of values for $C_{max}$ and $T_{max}$ encompass single dose values, multiple dose values, or both types of values. The portions of the specification cited by Roxane fail to demonstrate that this claim language should be read to exclude values obtained from multiple dose studies. However, the portions of the specification cited by Purdue strongly suggest that it was a principal purpose of the invention to facilitate the administration of controlled release oxycodone formulations in multiple dosing, steady state situations. Accordingly, on the basis of the claim language and specification, this Court concludes that the disputed claim language should be interpreted to encompass multiple dose values.

Finally, we turn to the prosecution history of the patents in suit to ascertain whether that history is consistent with our interpretation of the disputed claim language. In this context, Roxane contends that a number of passages in the specification of the '331 patent—the parent patent—militate in favor of excluding multiple dose values from the ranges of values specified for $C_{max}$ and $T_{max}$. Roxane points out, first, the only multiple dose study reported in the '331 patent fails to disclose values for $C_{min}$, which Roxane argues renders that study irrelevant, *see* '331 Patent, col. 18–19 (Ex. 13); Levy Decl. ¶ 28; second, the claims of the '331 patent that refer to $T_{max}$ specify that it occurs "after administration of the dosage form," *see* '331 Patent, col. 11–14; Levy Decl. ¶ 28; third, the passage appearing at column 1, lines 15–27 of the '331 patent mentions maximum concentration levels found in a single dose study, *see* Levy Decl. ¶ 29; and fourth, the '331 patent explicitly refers to "the methods set out in U.S. Pat[ent]

No. 4,990,341," which itself relies on single dose studies, see '331 Patent, col. 1, 1. 35–46; Patent No. 4,990,341, col. 1, 1. 39–44; Tr. at 40–41 (Opening Argument, John F. Sweeney).

Even assuming that these portions of the '331 specification are relevant to the proper interpretation of the claims in suit, see *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1026–27 (Fed.Cir.), *amended on reh'g*, 131 F.3d 1009 (Fed.Cir.1997). Roxane's arguments fail to carry the day. First, the fact that the only multiple dose study in the '331 specification fails to disclose $C_{min}$ values is hardly dispositive of the '912 claim language, given that the multiple dose study appearing in the '912 specification does disclose such values. *See* '912 Patent, col. 18 (Table 20). Second, the '331 claim language referring to $T_{max}$ occurring "after administration of the dosage form," is no less ambiguous than the claim language of the '912 patent and, therefore, is equally unhelpful. Third, the cited passage at column 1, lines 15–27 of the '331 specification is identical to that appearing at column 5, lines 5–16 of the '912 specification, which was discussed above and found not to resolve the ambiguity in dispute. And fourth, Roxane's argument that the '331 specification refers to the single dose methods of the '341 patent actually weighs against the result Roxane seeks; if in fact the authors of the '912 patent intended that $C_{max}$ and $T_{max}$ be defined solely by single dose values, then one would expect that they would have kept the parent specification's reference to the '341 patent's single dose methods rather than delete it from the '912 specification.

■ In conclusion, this Court finds for purposes of resolving Purdue's preliminary injunction motion that the ranges of values for $C_{max}$ and $T_{max}$ specified by the patents in suit encompass values obtained from multiple dose, steady state studies. Moreover, because this Court finds the intrinsic evidence sufficient to interpret the claim language, this Court will not consider the extrinsic evidence offered by the parties.

c. Preambles to the Claims in Suit

Purdue and Roxane also dispute whether the preambles to Claims 1 and 2 of the '042 and Claim 8 of the '295 patent should be interpreted as imposing limitations in addition to those set forth in the bodies of the claims. Specifically, the parties dispute whether the preambles to these claims should be read to require a reduction in the range of daily dosages as an independent limitation of the claimed inventions, above and beyond the limitations stated in the bodies of the claims.

As the Federal Circuit has explained, " '[a] claim preamble has the import that the claim as a whole suggests for it.' " *Rowe v. Dror*, 112 F.3d 473, 478 (Fed.Cir. 1997) (quoting *Bell Communications Res., Inc.*, 55 F.3d at 620). To ascertain this import, the Court must " 'review . . . the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim.' " *Id.* (quoting *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed.Cir.1989)). The ultimate object of this review is to determine whether the preamble merely states a use or purpose of the claimed invention, or else states a structural limitation necessary to give life to the invention:

[T]he preamble has been denied the effect of a limitation where . . . the claim or [interference] count apart from the introductory clause completely defined the subject matter [of the invention], and the preamble merely stated a purpose or intended use of that subject matter. On the other hand, in those . . . cases where the preamble to the claim or count was expressly or by necessary implication given the effect of a limitation, the introductory phrase was deemed essential to point out the invention defined by the claim or count. In the latter class of cases, the preamble was considered necessary to give life,

meaning and vitality to the claims or counts.

*Kropa v. Robie,* 38 C.C.P.A. 858, 187 F.2d 150, 152 (C.C.P.A.1951) (collecting cases), *quoted in Bell Communications Res., Inc.,* 55 F.3d at 620–21.

As before, this Court turns first to the claim language to ascertain the import of the preambles. In the '042 patent, the preambles both read, "A method for reducing the range in daily dosages required to control pain in human patients, comprising. . . ." And in the '295 patent, the preamble to Claim 8 reads, "A method for substantially reducing the range in daily dosages required to control pain in human patients, comprising. . . ." Unlike the bodies of the claims, which specify numerically precise properties of the oxycodone formulations to be administered, these preambles do not state numerical limits defining the precise extent to which the range of daily dosages should be reduced. Although this extent might be ascertained from the specifications, the fact that the preambles, unlike the bodies, fail to provide specific values suggests that the preambles do not state independent limitations. Moreover, the language of the bodies of the claims does not specifically reference or incorporate the language of the preambles, aside from a passing reference in Claim 8 of the '295 patent to providing "pain relief in said patient." *Cf. Bell Communications Res., Inc.,* 55 F.3d at 621 (explicit incorporation of preamble found dispositive).

Turning to the specifications of the '042 and '295 patents, the descriptions of the claimed invention repeatedly refer to a reduction in the range of daily dosages not as a structural feature of the administration of the oxycodone formulations set forth but rather simply as a benefit of the administration of those formulations. For example, the section of the specifications entitled "Detailed Description" opens, in both the '042 and the '295 patents, with the following passage:

It has now been surprisingly discovered that the presently claimed controlled release oxycodone formulations acceptably control pain over a substantially narrower, approximately four-fold (10 to 40 mg every 12 hours—around-the-clock dosing) in approximately 90% of patients. This is in sharp contrast to the approximately eight-fold range required for approximately 90% of patients for opioid analgesics in general.

'042 Patent, col. 3, 1. 38–45; '295 Patent, col. 3, 1. 34–41; *see also* '042 Patent, col. 2, 1. 16–20; col. 3, 1. 5–22, 46–51; col. 4, 1. 53–60; '295 Patent, col. 2, 1. 3–17; col. 3, 1. 1–18, 42–47; col. 4, 1. 51–58.

■ Accordingly, viewing each patent as a whole, this Court finds that the preambles do not state an independent limitation of the claimed inventions but merely set forth an intended use or benefit of the oxycodone formulations set forth in the claims. *See In re Hansen,* 37 C.C.P.A. 1169, 183 F.2d 92, 95 (C.C.P.A.1950), *discussed in Kropa,* 187 F.2d at 155.

### 2. Comparison of Roxicodone SR to the Claims in Suit

■ Purdue contends that Roxicodone SR satisfies every claim limitation of the patents in suit based on documentation submitted by Roxane to the FDA in its application for New Drug Approval. *See* Goldenheim Decl. ¶¶ 74–77. Because Purdue relies on essentially the same documentation to find infringement of all three patents in suit, this Court will focus on Purdue's demonstration with respect to Claim 2 the '912 patent. *See id.* ¶ 74 (citing attached Exhibits 9 and 10).

The first limitation of Claim 2 is that the oxycodone formulation comprise "from about 10 mg to about 160 mg of oxycodone or a salt thereof." Here, the Roxane Package Insert for Roxicodone SR states, "Each tablet for oral administration contains: Oxycodone hydrochloride." *Id.* Exh. 9, at 1. Moreover, the Summary of Basis for Approval ("SBA") submitted to the FDA states, "Strengths: 10 mg and 30

mg." *Id.* Exh. 10, at 17. The Court finds that the dosage levels of these tablets fall within the range of values specified by Claim 2 of the '912 patent.

Second, Claim 2 of the '912 patent requires "a mean maximum plasma concentration of oxycodone from about 6 to about 240 ng/ml from a mean of about 2 to about 4.5 hours after administration." Here, the SBA includes studies of Roxicodone SR 10 mg tablets, dosed every twelve hours, that demonstrate $C_{max}$ values of 12.68, 12.78, and 14.6 ng/ml, as well as $T_{max}$ values of 3.7, 4.3, and 4.0 hours after administration. *See id.* Exh. 10, at 147 (Table 1 and Figure 1), 152 (Table 1 and Figure 1). In addition, another chart included in the SBA shows predicted mean steady state plasma oxycodone levels following administration of the 20 mg tablets, including a $C_{max}$ that appears to be about 30 ng/ml and a $T_{max}$ that appears to fall between 2 and 4.5 hours. *See id.* Exh. 10, at 136 (Figure 7). The Court finds that these multiple dose values for Roxicodone SR fall within the ranges of values for $C_{max}$ and $T_{max}$ specified by Claim 2 of the '912 patent.

Third, Claim 2 indicates "a mean minimum plasma concentration from about 3 to about 120 ng/ml from a mean of about 10 to about 14 hours." Here, the SBA includes studies of Roxicodone SR 10 mg tablets, dosed every twelve hours, that demonstrate $C_{min}$ values of 7.77, 8.44, and 9.36 ng/ml; $T_{min}$ is inevitably about twelve hours after administration, given the twelve-hour dosing cycle. *See id.* Exh. 10, at 147 (Table 1 and Figure 1), 152 (Table 1 and Figure 1). In addition, another chart included in the SBA shows predicted mean steady state plasma oxycodone levels, after administration of the 20 mg tablets, including a $C_{min}$ that appears to be about 20 ng/ml and a $T_{min}$ that appears to fall between 10 and 14 hours. *See id.* Exh. 10, at 136 (Figure 7). The Court finds that these multiple dose values for Roxicodone SR fall within the ranges of values for $C_{min}$ and $T_{min}$ specified by Claim 2 of the '912 patent.

Finally, Claim 2 requires that such oxycodone levels occur in the bloodstream "after repeated administration every 12 hours through steady-state conditions." In this respect, the SBA states that the first study relied upon "is a steady state evaluation at an equivalent dose of 10 mg every 12 hours," *id.* Exh. 10, at 146; and that in the second study "steady state is expected to be achieved by end of day 2 of dosing," *id.* Exh. 10, at 151. As to the additional chart on which Purdue relies, the header to that chart reads, "Predicted mean steady state plasma oxycodone levels after . . . SR (20 mg q 12 hours)." *Id.* Exh. 10, at 136 (Figure 7). Moreover, the Roxane Package Insert states, "For control of severe chronic pain in patients, this drug should be administered on a regularly scheduled basis, every 12 hours." *Id.* Exh. 9, at 16. On these bases, the Court finds that Roxicodone SR satisfies the final limitation of Claim 2 of the '912 patent.

This Court therefore finds that Roxicodone SR satisfies every claim limitation of Claim 2 of the '912 patent. As to the other patents in suit, the Goldenheim Declaration also relies on these same studies and disclosures to find satisfaction of the claim limitations of Claims 1 and 2 of the '042 patent and Claim 8 of the '295 patent. *See id.* ¶¶ 75–77. In discussing those claims, the Goldenheim Declaration additionally highlights disclosures in the SBA that, first, Roxicodone SR is a "Controlled–Release Tablet," *id.* Exh. 10, at 17; and second, Roxicodone SR provides pain relief for at least 12 hours after administration, *see id.* Exh. 10, at 6; *id.* Exh. 9, at 16. Based on these studies and disclosures, this Court finds that Roxicodone SR also satisfies every claim limitation of Claims 1 and 2 of the '042 patent and Claim 8 of the '295 patent.

In sum, this Court concludes that Purdue has demonstrated a reasonable likelihood of success on the merits with respect to proving infringement at trial, and this Court further concludes that Purdue has made a clear showing in this regard.

## B. Validity

As noted earlier, Roxane argues that the patents in suit are invalid for lack of novelty because the inventions they claim were anticipated by inventions disclosed in earlier patents. In this context, Roxane raises two contentions: first, that Claim 1 of the '331 patent inherently anticipates the patents in suit and thereby renders them invalid; and second, that Example II, Formulation B, of Patent No. 4,861,598 ("the '598 patent") inherently anticipates the '331 patent and the patents in suit and thereby renders them invalid.

### 1. General Principles

Pursuant to 35 U.S.C. § 102, an invention may receive a patent only if it is "novel" in relation to the "prior art" available to the public at the time the patent application is filed. When the claimed invention "reads on" a prior art reference, the invention is said to be anticipated by that reference, and any claim purporting to patent the invention is deemed invalid. *See Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1346 (Fed.Cir.1999) (citing *Titanium Metals Corp. v. Banner*, 778 F.2d 775, 781 (Fed.Cir.1985)).

■ " 'To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention, either explicitly or inherently.' " *Id.* (quoting *In re Schreiber*, 128 F.3d 1473, 1477 (Fed.Cir.1997)); *accord MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed.Cir.1999). According to the classic formulation, "[t]hat which would literally infringe if later in time anticipates if earlier than the date of the invention." *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed.Cir.1987). "Specifically, when a patent claims a chemical composition in terms of ranges of elements, any single prior art reference that falls within each of the ranges anticipates the claim." *Atlas Powder Co.*, 190 F.3d at 1346 (citing *Titanium Metals Corp.*, 778 F.2d at 780–82).

■ A prior art reference may anticipate not only when the prior art reference expressly discloses every element of the claimed invention but also "when the claim limitation or limitations not expressly found in that reference are nonetheless inherent in it." *Id.* at 1347 (citing *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1369 (Fed.Cir. 1991)); *accord MEHL/Biophile Int'l Corp.*, 192 F.3d at 1365. Inherent anticipation arises when "the prior art necessarily functions in accordance with, or includes, the claimed limitations," regardless of whether persons of ordinary skill in the art would "recognize the inherent characteristics or functioning of the prior art." *Atlas Powder Co.*, 190 F.3d at 1347 (citing *In re King*, 801 F.2d 1324, 1326 (Fed.Cir.1986)); *accord MEHL/Biophile Int'l Corp.*, 192 F.3d at 1365; *see also Atlas Powder Co.*, 190 F.3d at 1347–48.

Accordingly, a defense of inherent anticipation requires proof that the claimed element is an inherent property or function of the prior art:

> Inherency ... may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient. If, however, the disclosure is sufficient to show that the natural result flowing from the operation as taught would result in the performance of the questioned function, it seems to be well settled that the disclosure should be regarded as sufficient.

*MEHL/Biophile Int'l Corp.*, 192 F.3d at 1365 (quoting *In re Oelrich*, 666 F.2d 578, 581 (C.C.P.A.1981)).

### 2. Anticipation by the '331 Patent

Roxane first contends that the '331 patent anticipates the patents in suit and thereby invalidates them pursuant to 35 U.S.C. § 102(e). *See* Levy Decl. ¶¶ 72–80. Section 102 states, in pertinent part, "A person shall be entitled to a patent unless—.... (e) the invention was described in a patent granted on an application for

patent by another filed in the United States before the invention thereof by the applicant for patent." In this context, the parties dispute whether the '331 patent is prior art relative to the patents in suit, a question that turns, at least initially, on whether the '331 patent may be considered a patent "by another" within the meaning of § 102(e).

### a. Patent "by another" Pursuant to § 102(e)

■ "[I]t is well settled that the applicant's own prior work will not anticipate his later invention unless that prior work is such as to constitute a statutory bar under § 102(b)." 1 Donald S. Chisum, Chisum on Patents § 3.08[2], at 3–151 (1999) (citing *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1581 n. 47 (Fed. Cir.1987)). However, where the inventive entity listed on a prior art patent overlaps with the inventive entity listed on a later patent, but is not identical to the latter entity, the prior art patent constitutes a patent "by another" pursuant to § 102(e) and therefore is capable of anticipating the later patented invention. *See In re Land*, 54 C.C.P.A. 806, 368 F.2d 866, 875–81 (C.C.P.A.1966) (patents issued to individual inventors found capable of anticipating later joint invention, even though all inventions shared common assignee); *see also In re Kaplan*, 789 F.2d 1574, 1575 (Fed. Cir.1986). At first blush, the *Land* decision would appear to be controlling, given that Robert F. Kaiko is listed as an inventor of the patents in suit but not of the '331 patent.

Purdue argues, however, that the present case is governed by the decision of the Federal Circuit in *Applied Materials, Inc. v. Gemini Research Corp.*, 835 F.2d 279 (Fed.Cir.1987). In that case, an initial patent application was filed, followed by two divisional patent applications, one of which was followed in turn by a continuation-in-part application. *See id.* at 280. The original application was eventually granted as Patent No. 3,623,712 ("the '712 patent"), listing two inventors, and the continuation-in-part application was eventually granted as Patent No. 4,081,313 ("the '313 patent"), listing the two '712 inventors plus an additional third inventor. *See id.* at 280–81. In a subsequent action alleging infringement of the '313 patent, the defense was raised that the '313 patent was anticipated by the '712 patent. *See id.* at 279–80. The Federal Circuit rejected this argument, reasoning as follows:

> [T]he fact that an application has named a different inventive entity than a patent does not necessarily make that patent prior art. As this court held in *In re Kaplan*, 789 F.2d 1574 (Fed.Cir.1986):
>
>> When the joint and sole inventions are related, as they are here, inventor A commonly discloses the invention of A & B in the course of describing his sole invention and when he so describes the invention of A & B he is not disclosing "prior art" to the A & B invention, even if he has legal status as "another" [35 U.S.C. § 102(e) ].
>
> *Id.* at 1576, quoting, *In re Land*, 54 C.C.P.A. 806, 368 F.2d 866, 879 (C.C.P.A.1966) (emphasis in original). Even though an application and a patent have been conceived by different inventive entities, if they share one or more persons as joint inventors, the 35 U.S.C. § 102(e) exclusion for a patent granted to "another" is not necessarily satisfied.
>
> In this case the applications which matured into the '712 and '313 patents all grew from the same original application. Accordingly, if the invention claimed in the '313 patent is fully disclosed in the '712 patent, this invention had to be invented before the filing date of the '712 patent and the latter cannot 102(e) prior art to the '313 patent. *See Land*, 368 F.2d at 879 ("When the 102(e) reference patentee ['712] ... had knowledge of the joint applicants' invention ['313] by being one of them, and *thereafter* describes it, he necessarily files the application *after* the ['313] applicant's invention date ....") (emphasis in origi-

nal). Thus, the district court erred because it [sic] invalidity decision was based on the incorrect premise that the '712 patent was 102(e) prior art against the '313 patent.

*Id.* at 281 (alterations in original).

On its facts, the *Applied Materials* decision is quite similar to the present case. It is less clear, however, whether the decision alters the general rule, applied in the *Land* decision, that an earlier patent is "by another" within the meaning of § 102(e) if the two inventive entities overlap but are not identical. It is unlikely that the Federal Circuit intended in *Applied Materials* to overrule that proposition, given that the *Applied Materials* decision cites *Land* with approval and makes no mention of reconsidering *Land. See also* 1 Chisum, Chisum on Patents § 3.08[2][a], at 3–156.1 to –156.4.

■■■ Rather, *Applied Materials* holds that if a parent patent fully discloses an invention that in fact is the work of an overlapping inventive entity and that is claimed in a continuing application listing that entity, then the presence of that subject matter in the earlier patent indicates that the present invention was already in existence as of the filing date of the parent application. And on that rationale, the invention disclosed in the earlier patent does not constitute prior art capable of anticipating the present invention. *See* 1 Chisum, Chisum on Patents § 3.08[2][a], at 3–156.2.

In this context, Purdue points out that, in order to prevail on its anticipation defense, Roxane must ultimately demonstrate that the '331 patent discloses " '*every* limitation' " of the patents in suit, either explicitly or inherently. *Atlas Powder*, 190 F.3d at 1346 (quoting *In re Schreiber*, 128 F.3d at 1477) (emphasis added). In other words, Purdue argues, a necessary premise of Roxane's anticipation argument is that the patents in suit are "fully disclosed" in the '331 patent as contemplated by *Applied Materials*. Therefore, Purdue reasons, as-

suming for the sake of argument that the '331 patent discloses "every limitation" of the later inventions and thereby "fully disclose[s]" those inventions, *Applied Materials* is directly applicable to the present case, since (1) the inventive entities of the respective patents are overlapping, and (2) the additional inventor named in the later patents had knowledge of the later inventions at the time of the parent patent application, *see generally* Robert F. Kaiko Decl. Accordingly, Purdue concludes, because *Applied Materials* is directly applicable, Roxane's anticipation defense must be rejected.

Purdue's reading of the disclosure requirement in *Applied Materials* is persuasive, given that the Federal Circuit rendered the decision in response to an anticipation defense and most likely had principles of anticipation in mind when it discussed the fact that the later invention was "fully disclosed" in the parent patent application. Purdue's reading is the simplest and most obvious interpretation of the decision, and rejection of Roxane's anticipation defense is appropriate on this basis alone. In the alternative, however, this Court will proceed to examine the additional arguments and counterarguments made by the parties in this context.

b. Disclosure of the Present Inventions in the '331 Patent Application

In response, Roxane disputes the applicability of *Applied Materials* to the present case by attacking Purdue's contention that the disclosure required to demonstrate anticipation is equivalent to the disclosure required by the *Applied Materials* decision. Specifically, Roxane highlights the statement in *Applied Materials* that "if the invention claimed in the '313 patent *is fully disclosed* in the '712 patent, this invention had to be invented before the filing date of the '712 patent and the latter cannot be 102(e) prior art to the '313 patent." 835 F.2d at 281 (emphasis added).

On this basis, Roxane argues that it would be anomalous for this Court to find that the present inventions are "fully disclosed" in the '331 patent application unless the '331 application is also found to satisfy the disclosure requirements of 35 U.S.C. §§ 112 and 120.

Section 120, on which Roxane relies, generally governs the antedating of a continuation application in order to obtain the earlier filing date of a parent patent application. That statute reads, in pertinent part:

> An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States ... which is filed by an inventor or inventors named in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

In other words, a continuing patent application is entitled to the earlier filing date of the parent application if and only if the following four conditions are satisfied:

> (1) the applications are submitted by the same inventor or inventors; (2) the applications were co-pending, meaning that the second application was filed while the first application was still pending; (3) the later application contains a specific reference to the prior application; and (4) the prior application disclosed the invention in the manner required by 35 U.S.C. § 112.

*Pfizer Inc. v. Perrigo Co.*, 933 F.Supp. 377, 380 (S.D.N.Y.1996) (citing 3 Ernest B. Lipscomb III, Lipscomb's Walker on Patents § 9:10, at 28 (1985)).

In the present case, Purdue and Roxane do not dispute conditions (2) and (3). The parties do disagree as to the satisfaction of condition (1); however, the case law of the Federal Circuit makes clear that where two patents have different but overlapping inventive entities, this fact *alone* will not preclude the antedating of the later patent, although this fact *in conjunction with* a lack of disclosure in the parent application will defeat an attempt to antedate. *See In re Chu*, 66 F.3d 292, 297 (Fed.Cir.1995). Consequently, the only condition disputed by the parties to the present case is condition (4) with respect to disclosure of the invention in the parent application.

As the text of § 120 indicates, the first paragraph of 35 U.S.C. § 112 governs the disclosure requirement. That paragraph reads:

> The specification [of the parent] shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The Federal Circuit has elaborated on the "written description" aspect of the disclosure requirement:

> The purpose of the "written description" requirement is broader than to merely explain how to "make and use"; the applicant must also convey with reasonable clarity to those skilled in the art that, as of the filing date sought, *he or she was in possession of the invention.* The invention is, for purposes of the "written description" inquiry, whatever is now claimed.

*Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1564 (Fed.Cir.1991) (emphasis added). What is important in applying this requirement is not whether "the ranges found in the applicant's claim language ...

correspond exactly to ranges disclosed in the parent"; rather, the key inquiry is whether "one skilled in the art could derive the claim limitations from the parent." *Ralston Purina Co. v. Far–Mar–Co. Inc.,* 772 F.2d 1570, 1575 (Fed.Cir.1985) (collecting cases). Consequently, the disclosure required to satisfy § 112 is distinct from the disclosure required for anticipation; in particular, if the parent application describes a single embodiment of a subject matter broadly claimed in a later application, then the parent description may suffice to anticipate the claims of the later application, even if that same description would not suffice to derive the broad claim limitations of the later application. *See Vas–Cath Inc.,* 935 F.2d at 1562 (quoting *In re Lukach,* 58 C.C.P.A. 1233, 442 F.2d 967, 970 (C.C.P.A.1971)).

In this context, Roxane argues that if the disclosure in the parent application is sufficient to anticipate the later application, but is insufficient to derive the claim limitations of the later application, then the parent application does not "fully disclose[ ]" the later invention as required to avoid anticipation pursuant to *Applied Materials.* Roxane's argument is persuasive. Specifically, the *Applied Materials* analysis looks to whether the later invention was "fully disclosed" in the parent application as a basis for inferring that the "invention had to be invented before the filing date" of the parent application. 835 F.2d at 281. Similarly, analysis under 35 U.S.C. §§ 120 and 112 looks to whether the parent application discloses that the inventor "was in possession of the invention" as a basis for entitling the invention to the earlier filing date of the parent application. *Vas–Cath Inc.,* 935 F.2d at 1564.

Although this Court declines to conclude that *Applied Materials* uniformly requires satisfaction of the disclosure requirement of §§ 120 and 112, the similarity in analyses does lead this Court to find the latter requirement relevant to the determination of "fall[ ] disclos[ure]" contemplated by *Applied Materials.* In the present case, Purdue fails to demonstrate how one skilled in the art might derive the claim limitations of the patents in suit from the disclosure of the '331 patent application. For example, Table 16 of the '331 patent discloses values of $C_{max}$ ranging from 6.1 to 36 ng/ml, but Purdue gives no indication how one might thereby derive the range of $C_{max}$ values extending to about 60 ng/ml in Claim 1 of the '042 patent, or the ranges of up to about 240 ng/ml in the other claims in suit. In addition, Purdue fails to point to any portion of the '331 application mentioning values of $C_{min}$, and Purdue does not show how one would derive the ranges stated by the claims in suit from the disclosure in the '331 application. *Cf. In re Blaser,* 556 F.2d 534, 538 (C.C.P.A.1977). Accordingly, Roxane has raised a substantial question as to whether the present inventions were "fully disclosed" in the parent application as required by *Applied Materials.*

c. Correction of the '331 Inventive Entity

In the alternative, Purdue suggests that this Court add Robert F. Kaiko to the listed inventors of the '331 patent, pursuant to the correction provisions in 35 U.S.C. § 256. Such a correction, Purdue maintains, would render the '331 patent the invention of the same inventive entity as the entity listed on the patents in suit.

■■■ To prove joint inventorship pursuant to § 256, a party must show that he (1) contributed in some significant manner to the conception or reduction to practice of the invention, (2) made a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) did more than merely explain to the real inventors well-known concepts and/or the current state of the art. *See Pannu v. Iolab Corp.,* 155 F.3d 1344, 1351 (Fed.Cir.1998) (citing *Fina Oil & Chem. Co. v. Ewen,* 123 F.3d 1466, 1473 (Fed.Cir.1997)).

On cross-examination of Kaiko, however, it was brought out that he had previously stated in his deposition testimony that, despite his participation in the *in vivo* experiments leading to the '331 application, he had not made an inventive contribution to the inventions claimed in the '331 patent. *See* Tr. at 97. On that basis, this Court finds that Purdue has not demonstrated a likelihood of success with respect to proving joint inventorship, and this Court declines to amend the inventive entity listed on the '331 patent.

### d. Prior Conception and Reduction to Practice of the Present Inventions

As a further alternative, Purdue contends that the '331 patent application is not prior art because the present inventions were conceived and reduced to practice prior to the filing date of the '331 application. Here, Purdue relies on the extensive case law discussing priority of invention pursuant to 35 U.S.C. § 102(g).

Pursuant to § 102(g), priority of invention generally " 'goes to the first party to reduce an invention to practice unless the other party can show that it was the first party to conceive the invention and that it exercised reasonable diligence in later reducing that invention to practice.' " *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed.Cir.1996) (quoting *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed.Cir.1993)), *on appeal after remand*, No. 97–1524, 155 F.3d 574, 1998 WL 388871 (Jul. 9, 1998) (unpublished opinion), *cert. denied*, 525 U.S. 1106, 119 S.Ct. 874, 142 L.Ed.2d 775 (1999). "In some instances, an inventor is unable to establish a conception until he has reduced the invention to practice through a successful experiment. This situation results in a simultaneous conception and reduction to practice." *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1206 (Fed.Cir.1991) (citing 3 Chisum, Chisum on Patents § 10.04[5] (1990)). In either case, "[p]riority, conception, and reduction to practice are questions of law which are based on subsidiary factual findings."

*Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed.Cir.1998) (citing *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed.Cir.1986)).

Conception requires a showing that the "inventor ... formed in his or her mind 'a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.' " *Mahurkar*, 79 F.3d at 1577 (quoting *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed.Cir.1994)); *accord Cooper*, 154 F.3d at 1327. This idea "must be 'so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research and experimentation.' " *Mahurkar*, 79 F.3d at 1577 (quoting *Burroughs Wellcome Co.*, 40 F.3d at 1228). Moreover, "where a party seeks to show conception through the oral testimony of an inventor," the party must produce independent evidence corroborating that testimony. *Id.* (citing *Price*, 988 F.2d at 1195). Such corroborating evidence is analyzed under a "rule of reason"; in other words, "[a]n evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Id.* (quoting *Price*, 988 F.2d at 1195).

Reduction to practice requires a demonstration that: "(1) [the inventor] constructed an embodiment or performed a process that met all the limitations of the interference count; and (2) he determined that the invention would work for its intended purpose." *Cooper*, 154 F.3d at 1327 (citing *UMC Elecs. Co. v. United States*, 816 F.2d 647, 652 (Fed.Cir.1987)); *accord Mahurkar*, 79 F.3d at 1578. Depending on the character, complexity, and function of the invention, test results of varying stringency may be required in order to show that the invention works for its intended purpose. *See id.* (collecting cases); *accord Cooper*, 154 F.3d at 1328. "In addition, the inventor must contemporaneously appreciate that the embodiment worked and

that it met all the limitations of the interference count." *Cooper*, 154 F.3d at 1328.

As a preliminary matter, this Court credits the testimony of one of the inventors, Benjamin Oshlack, that he and the other Purdue inventors developed the claimed oxycodone formulations by experimentation "on an interactive basis." Benjamin Oshlack Decl. ¶¶ 13, 27. In other words, the inventors of the patents in suit sought from the start to develop improved controlled-release oxycodone formulations and then experimented on a trial-and-error basis in order to determine which formulations appeared promising and which did not. *See also* Goldenheim Decl. ¶¶ 25–27. From this standpoint, there simply was no way for the inventors to conceive the specific limitations of the inventions in question until they found actual formulations that, when tested, produced the desired results, or in other words, until they reduced the inventions to practice. Accordingly, this Court concludes that this case presents an example of simultaneous conception and reduction to practice. *See Amgen, Inc.*, 927 F.2d at 1206.

In support of a finding of prior reduction to practice, Purdue has submitted the declaration of Robert F. Kaiko, a named inventor of the patents in suit. The Kaiko Declaration includes a number of attached documents dated prior to the '331 filing date—November 27, 1991—and these documents are intended to show "that the inventions disclosed and claimed in the patents-in-suit were made prior to the filing of the '331 patent application." Robert F. Kaiko Decl. ¶ 10. The first such document, attached as Exhibit 2, is purportedly "a copy of a collection of documents that [Kaiko] sent by fax to Dr. Chasin [another named inventor] on January 18, 1991." *Id.* ¶ 11. Kaiko explains this document as follows:

> The fourth page of the collection [P 039079] is a graphical representation of the relative bioavailability of controlled release oxycodone compared to immediate release oxycodone. The graph represents an analysis of Purdue's controlled-release oxycodone similar to that represented in Figure 5 of the Purdue patents-in-suit where the plasma concentration is plotted on a graph at various times. The graph was prepared under my direction and at my request. I believe that the analysis presented in this graph corresponds to the data set forth in Example 14 of the '912 patent.
>
> The curve for the controlled release oxycodone formulation in Exhibit 2, like Figure 5 of the '912 patent, demonstrated the relative comparability of bioavailability of the controlled release oxycodone formulation and the immediate release oxycodone against which the controlled release formulation was being compared. The graph also demonstrated the general slope of the curve of mean plasma concentrations over time that I believe would provide adequate pain relief for a 12 hour controlled release oxycodone formulation, including an indication of the range of $C_{max}$, $T_{max}$ and $C_{min}$ values appropriate for the invention.

*Id.* ¶¶ 11–12. The second document, attached as Exhibit 3, is a copy of a memorandum sent by Kaiko to Oshlack, Chasin, and Goldenheim on April 11, 1991, providing the data and information subsequently set forth in the '331 patent, at column 10, line 55 to column 11, line 12 and in Table 16. *See id.* ¶ 13. Finally, the third document, attached as Exhibit 4, is a copy of a memorandum sent by Goldenheim to Kaiko and others on July 16, 1991, referring to "Oxycodone Acrocontin" (later renamed OxyContin) as having "less variability in dose required over MS Contin." *Id.* ¶ 14.

Roxane counters that the Kaiko Declaration is insufficient to demonstrate prior conception and reduction to practice. Specifically, Roxane asserts that all of the named inventors of the patents in suit, and not simply Kaiko, must submit declarations to this Court as a prerequisite to finding prior conception and reduction to practice of the present inventions. Here,

Roxane relies on various provisions of the Manual of Patent Examining Procedure ("MPEP") that interpret 37 C.F.R. § 1.131 to require affidavits from all named inventors of the subject matter in question in order to entitle that subject matter to an earlier priority date.

However, Roxane's argument ignores two key points. First, 37 C.F.R. § 1.131 applies by its terms only to "any claim of an application or a patent under reexamination" in the Patent Office, whereas the present proceeding is district court litigation. The Federal Circuit has explicitly distinguished Patent Office proceedings from litigation, noting that different rules of procedure apply to each. *See In re Etter*, 756 F.2d 852, 857–58 (Fed.Cir.1985) (en banc) (presumption of validity pursuant to 35 U.S.C. § 282 applies only to litigation, not to Patent Office proceedings); *accord Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1427–29 (Fed.Cir.1988); *see also* Chisum, Chisum on Patents, § 3.08[3], at 3–162 (distinguishing between Rule 131 affidavits and priority contests in litigation). Second, even if § 1.131 were applicable, the interpretation of that regulation set forth in the MPEP is not binding on this Court, particularly with respect to the taking of evidence. *See Patlex Corp. v. Mossinghoff*, 771 F.2d 480, 486 (Fed.Cir. 1985) (MPEP " 'is primarily a set of instructions to the examining corps of the Patent Office' ") (quoting *In re Kaghan*, 55 C.C.P.A. 844, 387 F.2d 398, 401 (C.C.P.A. 1967)); *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1439 (Fed.Cir.1984) ("The MPEP has no binding force on us, but is entitled to notice."), *abrogated as to other holding, Two Pesos, Inc. v. Taco Cabana*, 505 U.S. 763, 775–76, 112 S.Ct. 2753, 2761, 120 L.Ed.2d 615 (1992); *accord In re Portola Packaging, Inc.*, 110 F.3d 786, 788 (Fed.Cir.), *reh'g & reh'g en banc denied*, 122 F.3d 1473 (Fed.Cir.1997).

We therefore turn to consideration of reduction to practice. First, this Court credits the testimony of Kaiko and finds that Exhibit 2 to his declaration demonstrates that he and the other inventors of the patents in suit had reduced to practice, as of January 18, 1991, an embodiment that met all of the limitations of the patents in suit. Figure 1 of Exhibit 2 demonstrates that the inventors had developed an oxycodone formulation demonstrating a $C_{max}$ of about 16 ng/ml, a $T_{max}$ of about 2.5 hours, a $C_{min}$ of about 7 ng/ml, and a $T_{min}$ of about 12 hours. In addition, the page preceding the Figure in question indicates that the oxycodone formulation was available in 10 and 30 mg tablets, and this Court credits Kaiko's testimony that the Figure demonstrates these formulations "would provide adequate pain relief for a 12 hour" formulation. Second, this Court finds, based on Kaiko's testimony and Exhibit 4, that the inventors appreciated by virtue of their experimentation that the formulations they produced worked for their intended purposes, that is, to provide pain relief for twelve hours and at the same time to reduce the range in daily dosages. Accordingly, this Court concludes that Purdue has demonstrated reduction to practice of the inventions in suit prior to the filing of the '331 patent application on November 27, 1991.

Next, this Court turns to conception of the inventions in suit. In light of the above discussion, as well as the additional fact that Exhibit 3 sets forth the *in vivo* data later disclosed in the '331 patent, this Court finds that the corroboration provided by the exhibits to the Kaiko Declaration is sufficient, under the rule of reason, to enable this Court to credit Kaiko's testimony that the inventors had conceived of a definite and permanent idea of the inventions prior to the filing of the '331 patent application. *See In re Clarke*, 53 C.C.P.A. 954, 356 F.2d 987, 992 (C.C.P.A.1966). Accordingly, Purdue has demonstrated conception of the inventions in suit prior to the filing of the '331 patent application on November 27, 1991.

In sum, the patents in suit are entitled to priority relative to the '331 patent and that the '331 patent therefore does not

constitute prior art capable of anticipating the patents in suit. This Court further concludes, keeping in mind Roxane's eventual burden of proof by clear and convincing evidence, that this aspect of Roxane's anticipation defense lacks substantial merit and that Purdue has made a clear showing in this regard.

### e. Merits of Anticipation by the '331 Patent

■ Finally, even assuming the '331 patent constitutes prior art, Purdue has clearly established a likelihood of success on the merits of Roxane's anticipation argument. As discussed earlier, Roxane argues that the '331 patent inherently anticipates the patents in suit. With respect to inherent disclosure of $C_{min}$ values falling within the claimed ranges, however, Roxane relies solely on the testimony of Levy that values within those ranges are "[i]nherent" to the formulations of the '331 patent, without providing documentary evidence to support this assertion. *See* Levy Decl. ¶ 80. But Federal Circuit case law explicitly states that "[a]n expert's conclusory testimony, unsupported by the documentary evidence, cannot supplant the requirement of anticipatory disclosure in the prior art reference itself." *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1473 (Fed.Cir.1997) (citing *Jamesbury Corp. v. Litton Indus. Prods., Inc.*, 756 F.2d 1556, 1563 (Fed.Cir.1985)); *accord W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1554 (Fed.Cir.1983) (reversal of judgment of invalidity on grounds that expert's testimony of inherent anticipation, unsupported by evidentiary record, cannot serve as basis for finding anticipation (citing *In re Felton*, 484 F.2d 495, 500 (C.C.P.A.1973))). Accordingly, this Court would reject Roxane's anticipation defense even in the absence of a finding of priority of invention with respect to the patents in suit.

### 3. Anticipation by Example II, Formulation B, of the '598 Patent

■ Roxane next contends that Example II, Formulation B, of the '598 patent inherently anticipates and therefore invalidates Claim 1 of the '331 patent as well as the claims of the patents in suit. *See* Levy Decl. ¶¶ 81–92. In this context, neither party disputes that the '598 patent constitutes prior art relative to the '331 patent, and the arguments focus instead on the merits of inherent anticipation.

The '598 patent contains ten claims, each of which claims an "[e]xtended action controlled release pharmaceutical composition for oral administration, comprising [an] effective amount of [an] active agent distributed in a controlled release core or matrix" exhibiting a particular chemical composition. *See* '598 Patent, col. 8. In other words, the '598 patent discloses chemical compositions designed to slow the *in vivo* release of the active ingredients of various pharmaceutical products in a controlled manner. In this context, Example II of the '598 patent describes a preferred embodiment of such compositions, namely "an oxycodone controlled release tablet . . . allow[ing] a controlled gradual release of active material over an approximate 9 to 10 hour period." *Id.* at col. 6, 1. 1–4. Specifically, Example II discloses two formulations, labeled A and B, which produced dissolution of 100% of the oxycodone ingredient within five and nine hours, respectively. Example II provides the chemical compositions of the two formulations, the method of preparing the appropriate tablets, and the method and results of *in vitro* dissolution tests using the two formulations.

Roxane asserts that Example II, Formulation B, inherently anticipates Claim 1 of the '331 patent as well as the claims of the patent in suit. With respect to Claim 1 of the '331 patent, Roxane notes that Formulation B provides *in vitro* dissolution results that correspond precisely to the ranges of Claim 1: 16% of the oxycodone in Formulation B was dissolved within 1 hour (between 12.5% and 55% as in Claim 1 of the '331 patent); 51% was

388

dissolved within 2 hours (between 45% and 75%); 70% was dissolved within 4 hours (between 45% and 75%); and 78% was dissolved within 6 hours (between 55% and 85%). With respect to Claim 1 of the '331 patent and each of the claims in suit, Roxane argues that the *in vivo* elements of those claims are inherent to Formulation B, in light of the following statement in the '598 disclosure:

[A] strong-correlation has been established between the in-vitro dissolution time determined for a dosage form and the in-vivo bioavailability. This correlation is so firmly established in the art that dissolution time has become generally descriptive of bioavailability potential for the active component of the particular unit dosage composition. In view of this relationship, it is clear that the dissolution time determined for a composition is one of the important fundamental characteristics for consideration when evaluating slow release compositions.

'598 Patent, col. 2, 1. 47–59.

To confirm that the *in vivo* elements of these claims are in fact inherent to Example II, Formulation B, Roxane commissioned a clinical study of the *in vivo* properties of Formulation B as administered to humans. The single-dose trials conducted as part of this study produced a $C_{max}$ of 9.44 ng/ml and a $T_{max}$ of 3.56 hours; and the multiple-dose or steady-state trials produced a $C_{max}$ of 12.26 ng/ml, a $T_{max}$ of 3.20 hours, and a $C_{min}$ of 5.16 ng/ml. *See* Roxane Mem.Opp.Prelim.Inj., at 20 & nn. 14–15; *accord* Michael J. Schobelock Decl. ¶¶ 3–8; James Hulse Decl. ¶¶ 1–9, Exh. 1–2. On the basis of these results, Roxane contends that Example II, Formulation B, of the '598 patent inherently satisfies the *in vivo* limitations of Claim 1 of the '331 patent and of the claims in suit.

Purdue presents two principal arguments in response to Roxane's anticipation defense: first, that the clinical study that produced the above data did not conform to either the composition or the methodol-

ogy of Example II, Formulation B, and therefore that the study is not probative of the inherent properties of that formulation; and second, that Roxane has not demonstrated inherent anticipation by Example II, Formulation B, with respect to other limitations of the claims in suit.

On its first line of attack, Purdue questions the probative value of the clinical study commissioned by Roxane. At the hearing on this motion, Purdue raised a number of points in its cross examination of Julia Economou, the Roxane scientist responsible for preparing the oxycodone formulation used in the clinical study. These points will be addressed in turn.

First, upon reviewing her laboratory notebook, *see* Pl.Exh. 10, Economou acknowledged she had passed the formulation through screens bearing mesh sizes not called for in Example II. At the same time, she attempted to minimize the significance of this discrepancy by explaining that such screening is a standard delumping procedure that would have no more effect on the formulation than sifting would on flour. *See* Tr. at 345–48; Tr. at 346, 1. 25. This Court finds that, even crediting Economou's testimony that the screening procedure was "just like ... sifting flour," her testimony does not demonstrate that the sifting would have no effect on solubility. Common sense suggests, for example, that a hard lump of flour may have a slower dissolution rate than an equal quantity of sifted flour. Although Economou testified that the screening procedure did not reduce the particle size of the formulation, she did state that the purpose was "to delump" the formulation. Tr. at 346, 1. 22–25. Therefore, this Court does not credit Economou's testimony that the screening procedure could not have had an effect on particle size.

Second, upon reviewing the laboratory notebook of Hugh Harbin, another Roxane scientist, *see* Pl.Exh. 11, Economou also admitted that the formulation was evaluated using the "HPLC" methodology rather

than the standard ultraviolet or "UV" method. *See* Tr. at 361–62. Purdue also introduced the testimony of the sole inventor of the '598 patent, Benjamin Oshlack, who asserted that this change in methodology as applied to dissolution tests would have skewed the results of the clinical study. *See* Oshlack Decl. ¶¶ 21–24. However, Economou explained that the HPLC method was used only to determine content uniformity and that the UV method was in fact used for the purpose of dissolution testing. The evidence introduced by Purdue corroborates Economou's explanation, *see* Pl.Exh. 11 at 262787 (noting use of methodology to determine content uniformity), and this Court therefore credits her testimony on this point.

Third, Economou also acknowledged that the "USP basket method" was used to perform the dissolution tests, rather than the "USP paddle method" specified in Example II (col.6, 1.37). *See* Tr. at 365–66. Economou testified that only the basket method was used at the time of the tests that produced the above data. *See id.* Furthermore, Purdue introduced into evidence a letter from Economou dated November 12, 1996, which stated, in the context of studies using these two methods, that "[i]t is difficult to perform a direct comparison of dissolution data because of the dissolution methodologies." Pl.Exh. 12 at 061816. Although Economou testified that this statement referred only to situations where both methods have not yet been performed and compared, *see* Tr. at 369, this consideration is irrelevant in light of the fact that only the basket method was used at the time of the tests in question. In short, Economou's statement quoted from Plaintiffs' Exhibit 12 suggests that it is difficult to compare the results of the Roxane study with Example II, Formulation B, because of the difference in methodologies, and therefore this Court does not credit her testimony to the contrary.

Fourth, Economou testified in her declaration that the oxycodone formulation used in the dissolution tests was prepared using 10.26 mg of oxycodone hydrochloride, which she deemed equivalent to the "9.2 mg" of "oxycodone" required by Example II, Formulation B. *See* Economou Decl. ¶ 6. In support of Economou's use of the hydrochloride or salt of oxycodone, Roxane introduced evidence that oxycodone base is "nearly insol[uble]" in water whereas one gram of the salt will dissolve in ten milliliters of water, Def.Exh. 9 (reprinting The Merck Index 1100 (11th ed.1989)); and Roxane further pointed to portions of the '598 specification that contemplate the use of "highly water soluble" forms of "oxycodone," col. 4, 1. 17–28. On these bases, Roxane contends that the '598 patent contemplates the use of the salt. *See* Levy Decl. ¶ 85. However, both Example II and the specification as quoted by Roxane refer simply to "oxycodone"; therefore, even assuming this term refers to oxycodone hydrochloride, consistent interpretation of the term would require interpreting Example II to require the use of 9.2 mg of oxycodone hydrochloride and not 10.26 mg as was actually used by Economou.

In contesting the asserted equivalency between the salt and base of oxycodone, Purdue further highlighted the differences in solubility between the two forms. In this vein, Purdue introduced results from early experiments by Oshlack tending to indicate that the salt dissolves too rapidly to make it practical for use in controlled release formulations of the sort claimed in the '598 patent. *See* Oshlack Decl. ¶¶ 19–20, Exh. 5. Although Economou acknowledged this difference in solubilities, she attempted to downplay its significance by testifying that the difference arises only in water and not in an acidic environment. At the same time, however, she acknowledged that only the first hour of dissolution in Example II occurs in an acidic environment, and was unable to state whether differences would arise in a non-acidic environment such as that used later in Example II. *See* Tr. at 359–64. Conse-

quently, this Court does not accept that one skilled in the art would consider the base and salt forms of oxycodone as equivalents for running the dissolution tests disclosed in Example II.

In sum, Purdue has demonstrated the existence of significant discrepancies between the clinical study commissioned by Roxane, on the one hand, and Example II, Formulation B, of the '598 patent, on the other hand. These discrepancies include differences in screening procedures, differences between the basket and paddle methods, and differences between the base and salt forms of oxycodone. Based on these discrepancies, this Court finds that one of skill in the art would not consider the clinical study commissioned by Roxane to be within the teachings of Example II, Formulation B, of the '598 patent. *See Glaxo, Inc. v. Novopharm Ltd.*, 830 F.Supp. 871, 877 (E.D.N.C.1993) (key consideration is whether "experiment ... would be considered to be within the teachings of" the prior art), *aff'd*, 52 F.3d 1043 (Fed.Cir.1995). Accordingly, the Roxane study possesses minimal, if any, probative value in assessing whether the *in vivo* limitations of the claims in suit and Claim 1 of the '331 patent are inherent to Example II, Formulation B, of the '598 patent.

On its second line of attack, Purdue contends that Roxane has failed to demonstrate anticipation of other elements of the claims in suit, in addition to the *in vivo* limitations. Specifically, Purdue notes that the claims of the '912 and '042 patents each require "repeated administration every 12 hours through steady-state conditions," and that Claim 8 of the '295 patent requires "administration every 12 hours after repeated dosing through steady-state conditions." Roxane has presented no evidence, however, that these limitations of the claims in suit are inherent to Example II, Formulation B, or that multiple dosing at twelve-hour intervals would be obvious to one of skill in the art in light of the disclosure of the '598 patent. *See In re Graves*, 69 F.3d 1147, 1152 (Fed.Cir.1995) (anticipation arises where prior art reference discloses claimed invention "such that a skilled artisan could take its teachings in combination with his own knowledge of the particular art and be in possession of the invention" (citing *In re LeGrice*, 301 F.2d 929, 936 (C.C.P.A.1962))); *cf. In re Boylan*, 55 C.C.P.A. 1041, 392 F.2d 1017, 1021–23 (C.C.P.A.1968).

Accordingly, and keeping in mind Roxane's eventual burden of proof by clear and convincing evidence, this Court concludes that Purdue's arguments against inherent anticipation by Example II, Formulation B, demonstrate that this aspect of Roxane's anticipation defense lacks substantial merit. Purdue has made a clear showing in this regard.

### C. Enforceability

As noted earlier, Roxane also contends that the patents in suit are rendered unenforceable by alleged inequitable conduct committed during the prosecution of the applications for the '331 patent and the patents in suit before the Patent Office. In this context, Roxane argues that three instances of inequitable conduct occurred during the prosecution of these patent applications: first, that the applicants' attorneys improperly filed a terminal disclaimer in order to overcome an objection by the Patent Examiner that the '331 patent was "obvious" (that is, not sufficiently novel) in relation to the invention claimed in Patent No. 4,990,341 ("the '341 patent"), pursuant to 35 U.S.C. §§ 102(e) and 103; second, that the applicants and their attorneys failed to disclose material prior art to the Patent Examiner, namely, Patent No. 4,844,909 ("the '909 patent"), during prosecution of the '331 patent application; and third, that the applicants and their attorneys failed to advise the Patent Examiner that the '331 patent was prior art pursuant to 35 U.S.C. § 102(e) during prosecution of the applications for the patents in suit. *See* John T. Goolkasian Decl. ¶ 7.

### 1. General Principles

▮ An otherwise valid patent may be rendered unenforceable by virtue of inequitable conduct committed during the prosecution of the patent application before the Patent Office. Inequitable conduct may arise when applicants or their attorneys breach their duty "to prosecute patent applications in the [Patent Office] with candor, good faith, and honesty." *Elk Corp.*, 168 F.3d at 30 (citing *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir.1995)); *see also* 37 C.F.R. § 1.56 (1999) (defining the duty). Ultimately, a party seeking to prove inequitable conduct must provide clear and convincing evidence of "affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1327 (Fed.Cir.1998) (citing *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068–71 (Fed. Cir.1998)); *see Elk Corp.*, 168 F.3d at 30.

Inequitable conduct entails a two-step analysis. "First, the trial court must determine whether the withheld reference meets a threshold level of materiality [and] whether the evidence shows a threshold level of intent to mislead the" Patent Office. *Baxter Int'l, Inc.*, 149 F.3d at 1327 (citing *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1439 (Fed.Cir. 1991)). Both materiality and intent are questions of fact. *See Elk Corp.*, 168 F.3d at 30–31; *Baxter Int'l, Inc.*, 149 F.3d at 1327. Second, "[o]nce the threshold levels of materiality and intent have been established, the trial court is required to weigh materiality and intent" in order to determine, "[i]n light of all the circumstances, ... whether the applicant's conduct is so culpable that the patent should be held unenforceable." *Baxter Int'l, Inc.*, 149 F.3d at 1327 (citing *Molins PLC*, 48 F.3d at 1178). "The more material the omission, the less evidence of intent will be required in order to find that inequitable conduct has occurred." *Id.* (citing *N.V.*

*Akzo v. E.I. Dupont de Nemours*, 810 F.2d 1148, 1153 (Fed.Cir.1987)). The finding of culpability is committed to the discretion of the trial court. *See Elk Corp.*, 168 F.3d at 30 (citing *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 876 (Fed.Cir.1988) (en banc)); *Baxter Int'l, Inc.*, 149 F.3d at 1327 (citing *Kolmes v. World Fibers Corp.*, 107 F.3d 1534, 1541 (Fed.Cir.1997)).

Because all the relevant proceedings took place in the Patent Office after March 16, 1992, the following standard of materiality applies:

> [I]nformation is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
>
> > (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
> >
> > (2) It refutes, or is inconsistent with, a position the applicant takes in:
> >
> > > (i) Opposing an argument of unpatentability relied on by the Office, or
> > >
> > > (ii) Asserting an argument of patentability.
>
> A claim is unpatentable under the preponderance of the evidence, burden of proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

37 C.F.R. § 1.56(b) (1999); *see Baxter Int'l, Inc.*, 149 F.3d at 1327–28 & n. 3 (explaining applicability of this standard in relation to previous standard); *Molins PLC*, 48 F.3d at 1179 & n. 8 (same).

▮ With respect to intent, direct proof is not necessary; rather, " 'wrongful intent may be inferred from clear and convincing evidence of the surrounding circumstances.' " *Baxter Int'l, Inc.*, 149 F.3d at 1329 (citing *LaBounty Mfg., Inc. v.*

*United States Int'l Trade Comm'n,* 958 F.2d 1066, 1076 (Fed.Cir.1992)). "[A]lthough intent may be inferred from circumstantial evidence mere gross negligence is insufficient to justify an inference of an intent to deceive the" Patent Office. *Id.* (citing *Kingsdown Med. Consultants, Ltd.,* 863 F.2d at 876). Finally, "[i]n a case involving an omission of a material reference to the [Patent Office], there must be clear and convincing evidence that the applicant made a deliberate decision to withhold a known material reference." *Id.* (citing *Molins PLC,* 48 F.3d at 1181).

## 2. Improper Terminal Disclaimer

Roxane first alleges that the attorneys prosecuting the '331 patent application filed an improper terminal disclaimer in order to overcome an objection by the Patent Examiner that the invention claimed in the '331 application was obvious in light of the '341 patent. In this context, the parties do not appear to dispute that a terminal disclaimer is incapable of overcoming a rejection on grounds of obviousness pursuant to 35 U.S.C. §§ 102(e) and 103. *See In re Bartfeld,* 925 F.2d 1450, 1453–54 (Fed.Cir.1991); Manual of Patent Examining Procedure, § 804, at 800–24, 830 (7th ed. July 1998). Pursuant to §§ 102(e) and 103, a patent application may not be granted if the claimed invention is "obvious" in light of some prior art reference, that is, "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103; *see In re Bartfeld,* 925 F.2d at 1451 & n. 4 (discussing §§ 102(e) and 103). If a patent is rejected for obviousness pursuant to these sections, "terminal disclaimers are neither appropriate nor available." *In re Bartfeld,* 925 F.2d at 1453.

Nonetheless, a terminal disclaimer may constitute an appropriate means of overcoming a rejection on grounds of obviousness-type double patenting. *See id.* at 1453–54. In general, a rejection on grounds of double patenting relies upon an analysis similar to the obviousness analysis relevant to a rejection pursuant to §§ 102(e) and 103; the key difference is that a double-patenting rejection looks solely to the claims of the prior art reference, and not to the entire disclosure of the prior art reference, as the basis for comparison. *See id.* at 1453. A rejection for double patenting may be either for "same-invention-type" double patenting, meaning that the claimed inventions are identical, or for "obviousness-type" double patenting, meaning that the claimed invention is obvious in light of the claims of the prior art reference. *See, e.g., In re Boylan,* 55 C.C.P.A. 1041, 392 F.2d 1017, 1021–23 (C.C.P.A.1968) (where prior art claimed composition, and later patent claimed process using composition, claimed inventions were not "same invention" for double patenting purposes). If a double-patenting rejection is of the obviousness type, and if both the prior art and the present invention share a common assignee, then the rejection may be overcome by a terminal disclaimer, which simply disclaims any rights in the later patent insofar as they may extend into the future beyond the term of the prior art. *See In re Bartfeld,* 925 F.2d at 1452–54 (citing *In re Longi,* 759 F.2d 887 (Fed.Cir.1985)).

Against this backdrop, the parties dispute the significance of the following facts: On April 30, 1992, the Patent Office rejected the '331 application pursuant to 35 U.S.C. §§ 102(e) and 103, on grounds that the invention claimed was obvious in relation to the '341 patent, in light of the teachings of the '598 patent. *See* Patent File History ("FH") at 34–35. The applicants later contested this rejection on the merits of obviousness. *See id.* at 43 ("One skilled in the art would certainly not arrive at this surprising result without the benefit of hindsight."). However, on February 3, 1993, the Patent Office again rejected

the '331 application, on the same grounds as stated in the April 30 rejection. *See id.* at 44–46. On February 25, 1993, the Patent Examiner held an interview with the attorneys prosecuting the '331 patent application. The remarks written by the Examiner subsequent to the interview read, in pertinent part, as follows:

Discussed nature dissolution rate with regard to prior art. Applicant will submit proposed declaration supporting unobviousness and unexpected results. Terminal disclaimer will be filed. Favorable consideration will be given for the proposals discussed regarding allowability.

*See id.* at 47.

Based on these facts, Roxane argues that the attorneys prosecuting the '331 patent application improperly filed a terminal disclaimer in order to overcome the February 3 rejection on grounds of obviousness pursuant to 35 U.S.C. §§ 102(e) and 103. Roxane further contends that the filing of the disclaimer constituted inequitable conduct because the applicants' attorneys were under a duty to disclose that the filing of such a disclaimer was not possible as a matter of law. *See* Goolkasian Decl. ¶¶ 43–44. Purdue responds both by contesting the materiality of the attorneys' alleged failure to highlight this legal point and by producing additional evidence that, it asserts, negates Roxane's proof of wrongful intent.

First is the question of materiality. Here, Purdue argues that the duty of candor and the doctrine of inequitable conduct pertain only to the disclosure of factual information and not to the raising of legal arguments. Indeed, the case law discussing inequitable conduct focuses on factual information such as the existence of prior art, *see Molins PLC,* 48 F.3d at 1179, or the submission of false or misleading affidavits, *see Refac Int'l, Ltd. v. Lotus Dev. Corp.,* 81 F.3d 1576, 1581 (Fed.Cir.1996). In addition, Purdue cites a number of cases suggesting that the mere failure to raise a legal point cannot give rise to

inequitable conduct. *See Akzo N.V. v. U.S. Int'l Trade Comm'n,* 808 F.2d 1471, 1482 (Fed.Cir.1986); *Environ Prods., Inc. v. Total Containment, Inc.,* 951 F.Supp. 57, 61 (E.D.Pa.1996).

Purdue's argument has persuasive value, particularly in light of the *Akzo N.V.* decision. As a policy matter, moreover, it would make little sense to penalize parties for raising or failing to raise particular legal arguments; such penalties could unduly burden a party with having to pose hypothetical objections to its own legal position, and the Patent Office is undoubtedly competent to determine and to apply the law in proper fashion, regardless of what legal arguments a party does or does not raise. However, because of the paucity of Federal Circuit decisions discussing the materiality of legal arguments, and because the point of law the attorneys allegedly failed to raise would have refuted an attempt to overcome an obviousness rejection using a terminal disclaimer, *cf.* 37 C.F.R. § 1.56(b)(2)(ii), this Court will assume *arguendo* that the minimum threshold of materiality has been met and proceed accordingly.

■ This Court therefore turns to the question of intent. Here, Purdue relies on the testimony of Harold D. Steinberg, the lead attorney in the prosecution of the '331 application before the Patent Office. Steinberg testified that at the interview on February 25, 1993, the Patent Examiner stated he would consider a declaration in support of a finding of non-obviousness but that even in the absence of an obviousness rejection he was inclined to reject the '331 application on grounds of double-patenting. Steinberg further testified that it was in response to these remarks that he submitted a declaration from Robert F. Kaiko in support of a finding of non-obviousness, as well as the terminal disclaimer in the event of a double-patenting rejection. *See* Harold D. Steinberg Decl. ¶¶ 12–14. Steinberg also asserted that his account of the February 25 interview is corroborated by

the following remarks, which he wrote subsequent to the interview:

> At the conference, [Patent] Examiner Spear indicated that it seemed that the applicants herein were nevertheless trying to claim the same invention as that set forth in the cited Goldie, et al. patent [that is, the '341 patent]. In order to avoid this possibility, a Terminal Disclaimer is submitted herewith, along with the appropriate fee, disclaiming the terminal portion of any patent to be issued in this case beyond the expiration date of the Goldie, et al. patent.

FH 50.

Roxane counters Steinberg's account of these events on a number of grounds. First, Roxane argues that Steinberg's testimony as to the Patent Examiner's out-of-court statements constitutes inadmissible hearsay evidence. However, Purdue offers Steinberg's testimony, both in his Declaration and in his written remarks, not to prove the truth of the Patent Examiner's statements but merely to prove the fact that the statements were said and, by inference, to demonstrate Steinberg's state of mind upon hearing them, as is relevant to the question of intent. Because Steinberg's testimony is not offered to prove the truth of the Patent Examiner's statements, his testimony is not hearsay and is therefore admissible for the purpose of proving his state of mind. *See Barrett v. Orange County Human Rights Comm'n,* 194 F.3d 341, 347–48 (2d Cir.1999).

Second, in a separate bench memorandum, Roxane asserts that Steinberg's testimony is simply not credible because (a) the Patent Examiner never formally issued an obviousness-type double-patenting rejection, and (b) it would have been illogical for the Patent Examiner to do so, even assuming that Kaiko's declaration had overcome the obviousness rejection, because the standard for issuing an obviousness-type double-patenting rejection follows an analysis similar to the standard for issuing an obviousness rejection pursuant to 35 U.S.C. §§ 102(e) and 103. But, as explained earlier, there does exist a relevant difference between these two types of rejections: A rejection for obviousness must be based on a comparison of the invention to the entirety of the disclosure in the prior art reference, whereas an obviousness-type double-patenting rejection must be grounded on a comparison of the invention to the claims, and only the claims, of the prior art reference. *See Quad Envtl. Techs. Corp. v. Union Sanitary Dist.,* 946 F.2d 870, 873–74 (Fed.Cir. 1991); *In re Bartfeld,* 925 F.2d at 1453–54. Therefore, it would not have been inconsistent for the Patent Examiner to withdraw the obviousness rejection and then to issue an obviousness-type double-patenting rejection.

Third, Roxane conjectures that, even if Steinberg's testimony is admissible and credible, the reference to the applicants' purported attempts to "to claim the *same* invention" (emphasis added) indicates that the Patent Examiner must have contemplated a double-patenting rejection of the same-invention type and not of the obviousness type; in this event, a terminal disclaimer would still have been inappropriate. But Roxane's conjecture simply does not square with the facts. To issue a same-invention-type double-patenting rejection, the Patent Examiner would have had to compare the claims of the '331 and '341 patents and to find that the claimed inventions were identical. Yet, the '341 patent discloses hydromorphone formulations, whereas the '331 patent discloses oxycodone formulations. *See* Tr. at 220 (testimony of Alphonse R. Noë). Seen in this light, it is much more reasonable to hypothesize that the words "same invention" referred, however imprecisely, to a contemplated double-patenting rejection of the obviousness type.

This Court credits Steinberg's testimony, as given both in his Declaration and at the hearing on this motion. Accordingly, Steinberg submitted the terminal disclaimer in the belief that the Patent Examiner intended to issue an obviousness-type dou-

ble-patenting rejection. Accordingly, Roxane has failed to establish the threshold level of wrongful intent to deceive the Patent Office.

### 3. Failure to Disclose the '909 Patent as Prior Art

Second, Roxane charges that the attorneys who prosecuted the '331 patent application committed inequitable conduct when they failed to disclose the existence of material prior art, namely, the '909 patent. *See* Goolkasian Decl. ¶¶ 48–53; *see also id.* Exh. 2 (reprinting the '909 patent). In support of its theory, Roxane introduced the testimony of John T. Goolkasian, a patent attorney and former Patent Examiner. Goolkasian did not dispute that the attorneys who prosecuted the '331 patent application disclosed the existence of the '341 patent, which was a continuation of the '909 patent, as prior art, *see* Tr. at 500–01; nor did he dispute that the '341 and '909 patents "contain[ ] the same teachings" and have "virtually identical" disclosures, *see* Goolkasian Decl. ¶¶ 48, 53. However, Goolkasian contended that the '909 patent was not cumulative to the '341 patent because it qualifies as prior art pursuant to 35 U.S.C. § 102(b) and, unlike the '341 patent, triggers the § 102(b) statutory bar by virtue of predating the '331 patent by over a year.[3] *See id.* ¶ 48. On this basis, Goolkasian argued inequitable conduct lay in the fact that the failure to cite the '909 patent led the Patent Examiner to accept the terminal disclaimer, in violation of the § 102(b) statutory bar, as indicated by the Patent Examiner's reliance on § 102(e) and not § 102(b) in rejecting the '331 application for obviousness. *See* Tr. at 481–83; 498.

As before, this Court turns first to the question of materiality. "[A] patentee has no obligation to disclose an otherwise material reference if the reference is cumulative or less material than those already before the patent examiner." *Halliburton*, 925 F.2d at 1440 (citing *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 992 (Fed.Cir.1988)); *accord Elk Corp.*, 168 F.3d at 30; 37 C.F.R. § 1.56(b). "When weighing whether uncited prior art is more material than that before the examiner, a trial court considers similarities and differences between the prior art and the claims of the patent," with consideration given to those portions of the prior art reference "which teach away from the claimed invention." *Halliburton*, 925 F.2d at 1441 (citing *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 448–49 (Fed.Cir.1986)).

In its argument that the '909 patent was not cumulative by virtue of the § 102(b) statutory bar, Roxane relies exclusively on the decision in *Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870 (Fed.Cir.1991). However, that decision simply explains that a terminal disclaimer filed to obviate a double-patenting rejection is incapable of removing the prior art reference in order to overcome a rejection for obviousness pursuant to 35 U.S.C. §§ 102(b) and 103. *See id.* at 873–74 ("Thus the 'obviation' of obvious-type double patenting by filing a terminal disclaimer has no effect on a rejection under § 103 based on the first-filed patent. Such a rejection can not be overcome by a terminal disclaimer." (citing *In re Bowers*, 53 C.C.P.A. 1590, 359 F.2d 886, 891 n. 7 (C.C.P.A.1966))). Contrary to Roxane's argument, therefore, the decision in *Quad Envtl. Techs. Corp.* implicitly suggests that a terminal disclaimer *is* an appropriate means of overcoming a double-patenting rejection issued with respect to a prior art reference, even where that same reference would qualify as a statutory bar in the

---

**3.** 35 U.S.C. § 102(b) bars the grant of a patent if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, *more than one year* prior to the date of the application for patent in the United States" (emphasis added). *See* 2 Lipscomb's Walker on Patents § 7:2, at 379.

event of an obviousness rejection pursuant to §§ 102(b) and 103.

Therefore, the terminal disclaimer during the prosecution of the '331 patent application was no more or less capable of overcoming an obviousness rejection with respect to the '341 patent pursuant to §§ 102(e) and 103 than it would have been capable of overcoming a hypothetical obviousness rejection with respect to the '909 patent pursuant to §§ 102(b) and 103. In either situation, the terminal disclaimer would have been equally incapable of overcoming the obviousness rejection, based simply on the nature of the rejection. Moreover, the terminal disclaimer was no more or less capable of obviating a double-patenting rejection with respect to the '341 patent than it would have been with respect to the '909 patent. In both situations, the terminal disclaimer would have been equally capable of obviating the double-patenting rejection, because a terminal disclaimer is appropriate in such a situation, as is consistent with the decision in *Quad Envtl. Techs. Corp.* Accordingly, this Court concludes that the '909 patent is cumulative to the '341 patent and therefore that there was no duty to disclose the '909 patent as prior art to the Patent Office.

4. Failure to Disclose the '331 Patent as Prior Art

■ Finally, Roxane contends that the applicants and their attorneys failed to advise the Patent Examiner that the '331 patent was prior art pursuant to 35 U.S.C. § 102(e) during prosecution of the applications for the patents in suit. *See* Goolkasian Decl. ¶¶ 54–62. On cross examination, however, Goolkasian did not dispute that the '331 patent was disclosed in the following fashion during each of the prosecutions: During the '912 prosecution, the '331 patent was disclosed as the parent patent of which the '912 application was a continuation, the '331 patent was discussed in an Office Action, *see* FH at 221, and it also was discussed in the terminal disclaimer submitted to the Patent Office, *see*

FH at 223–24. During the '042 prosecution, the '331 patent was included in the information disclosure statement submitted to the Patent Office, *see* FH at 324. And during the '295 prosecution, the '331 patent was again included in the information disclosure statement submitted to the Patent Office, *see* FH at 397. *See generally* Tr. at 486–90.

The Federal Circuit has explained that "[w]hen a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it can not be deemed to have been withheld from the examiner." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1582 (Fed.Cir.), *reh'g denied*, No. 89–1541, 1991 WL 525082 (Fed.Cir. Apr. 30, 1991); *accord* 37 C.F.R. § 1.56(a) (1999) (duty of disclosure satisfied where prior art is cited by Patent Office or properly included in information disclosure statement). Accordingly, Roxane's contention that the '331 patent was improperly withheld must be rejected.

■ At the evidentiary hearing in this action, Goolkasian additionally testified that inequitable conduct occurred (a) when the applicants and their attorneys failed to correct the Patent Examiner's mistakes in evaluating the obviousness of the applications in light of the '331 patent, and (b) when the applicants and their attorneys failed to explain the relevance of the patents included on the information disclosure statements. *See* Tr. at 491–93. But neither Roxane nor Goolkasian has cited any authority for imposing such higher burdens of disclosure on patent applicants and their attorneys. *Cf.* 37 C.F.R. § 1.98(a)(3) (1999). Accordingly, these additional arguments must also be rejected.

Keeping in mind Roxane's ultimate burden of proof by clear and convincing evidence, this Court concludes that Purdue has shown that each of Roxane's defenses of inequitable conduct lacks substantial merit. This Court further concludes that Purdue has made a clear showing in this regard.

## D. Conclusion

Accordingly, Purdue has established a reasonable likelihood of success on the merits, and Purdue has made a clear showing in this regard.

## III. Irreparable Harm

■ As noted above, if the moving party "clearly establishe[s] the first factor (by making a 'clear showing' of both validity and infringement), it [is] entitled to a rebuttable presumption" of irreparable harm, which constitutes the second factor considered on a motion for a preliminary injunction. *Polymer Techs.*, 103 F.3d at 973 (citing *Smith Int'l, Inc.*, 718 F.2d at 1581). This presumption is grounded in "the very nature of the patent, which provides the right to exclude," a right whose violation may be deemed irreparable in the event of a clear showing on the merits, independent of any monetary damages arising as a consequence. *Id.* Because this Court has already concluded that Purdue has made clear showings of infringement, validity, and enforceability, it further concludes that Purdue is entitled to a presumption of irreparable harm.

In order to rebut this presumption of irreparable harm, Roxane may introduce evidence that:

(1) the non-movant has or will soon cease the allegedly infringing activities, thus making an injunction unnecessary; (2) movants have engaged in a pattern of granting licenses under the patent, such that it may be reasonable to expect that invasion of the patent right can be recompensed with a royalty rather than with an injunction; or (3) movants unduly delayed in bringing suit, thereby negating the idea of irreparability.

*Polymer Techs.*, 103 F.3d at 974 (citations omitted); *see also Reebok Int'l Ltd.*, 32 F.3d at 1556. However, Roxane need not limit its rebuttal to these theories, provided that it offers "similar evidence" to negate the presumption of irreparable harm. *Id.*

■ In its papers and at the hearing on this motion, Roxane focused its arguments on contesting the account of irreparable harm provided by Purdue. Purdue's proof relied primarily on the testimony of Jerry A. Hausman, a Professor of Economics at the Massachusetts Institute of Technology. Hausman testified that the introduction of Roxicodone SR into the market pending a full resolution on the merits would irreparably harm the advantageous position of OxyContin as the sole controlled-release oxycodone-based analgesic presently on the market, principally because Roxicodone SR would compete with OxyContin for sales and would force Purdue to lower the price of OxyContin generally, a phenomenon known as "price erosion." *See* Jerry A. Hausman Decl. ¶¶ 10–11. According to Hausman, the effects of this price erosion would last for decades, even assuming the issuance of a permanent injunction following trial, because of the opposition Purdue would face from its purchasers in attempting to raise its prices subsequently. *See id.* ¶¶ 56–59. Hausman also testified that irreparable harm would arise as a result of the difficulties this Court would face at the end of trial in calculating damages with respect to (a) future effects of price erosion, (b) loss of experienced staff following from cuts required by the loss of revenue, (c) disruption to Purdue's sales force from having to respond to the introduction of Roxicodone SR, and (d) lost allocation of revenues to further research and development, together with the consequent lost future opportunities in the marketplace. *See id.* ¶¶ 61–63.

In response, Roxane relied primarily on the testimony of Richard T. Rapp, an economist and President of the National Economic Research Associates. Rapp testified that Purdue could be compensated for lost sales simply by looking to Roxane's receipts, and any lowering in the price of OxyContin could actually expand the market sufficiently to permit Purdue to increase its sales and recoup any lost reve-

nue. *See* Richard T. Rapp Decl. ¶¶ 18–23. Rapp further testified that price erosion was an unlikely consequence because (1) Roxane intends to market its product at a price comparable to that of OxyContin, (2) as the first product in a highly desirable market niche, OxyContin will be unusually resistant to price erosion, under the theory of "first mover advantage," (3) Roxane will not be able to grab a significant fraction of the market in the time required to resolve this case on the merits, and (4) OxyContin is likely to experience competition from non-infringing analgesic products also designed to treat moderate to severe pain. *See id.* ¶¶ 24–31; Tr. at 567–69.

However, Hausman disagreed with Rapp's characterization of the likely harms. Hausman explained that market expansion was unlikely to compensate for lowered prices, since manufacturers faced with such a situation suffer a decrease in total revenues. *See* Hausman Decl. ¶ 17. Hausman further explained that, regardless of Roxane's marketing strategies, OxyContin is likely to compete intensely with Roxicodone SR simply because OxyContin and Roxicodone SR share an advantageous combination of features not enjoyed by any other product currently on the market: (1) the product is a single entity; (2) the product uses oxycodone as an active ingredient; (3) the product is a controlled release analgesic; and (4) the product uses an oral tablet delivery mechanism. *See id.* ¶¶ 19–38. Finally, Hausman also explained that OxyContin is particularly likely to suffer significant price erosion within a short time because the very presence of Roxicodone SR on the market, independent of the factors cited by Rapp, will significantly increase the bargaining power of major purchasers, such as health maintenance organizations, who frequently negotiate with Purdue for discounts off the list price when purchasing large quantities of analgesic products. *See id.* ¶¶ 39–53.

This Court credits Hausman's testimony and finds that Roxane has failed to rebut his account of the irreparable harm that will flow to Purdue from a refusal to grant a preliminary injunction. In fact, the scenario presented by Hausman, which suggests that Purdue could permanently lose its advantageous position in the analgesics market, is similar to scenarios found to support irreparable harm even in the absence of a presumption to that effect. *See Hybritech Inc.*, 849 F.2d at 1456–57.

In its post-hearing memorandum, Roxane presents two additional arguments that merit brief mention. First, Roxane contends that any damages suffered by Purdue would be minimal and can be paid by defendants. *See* Post–Hearing Memo at 22–23. However, "[i]t is well settled that, because the principal value of a patent is the statutory right to exclude, the nature of the patent weighs against holding that monetary damages will always suffice to make the patentee whole." *Hybritech*, 849 F.2d at 1456–57 (citing *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed.Cir.1987)). Second, Roxane argues that Purdue's allegations of harm are unsupported and speculative. *See* Post–Hearing Memo at 23–24. However, this argument misconceives the burden of proof effected by the presumption of irreparable harm; it is not Purdue who must affirmatively demonstrate the likelihood of harm but rather Roxane who bears the burden of rebutting the presumption of harm that attaches in this action. *See Reebok Int'l Ltd.*, 32 F.3d at 1556; *Polymer Techs.*, 103 F.3d at 974.

Subsequent to the hearing on this motion, Purdue notified the Court that Roxane had requested that the FDA stay its New Drug Application—which the FDA apparently reopened on petition from Purdue—pending Roxane's submission of additional data with respect to Roxicodone SR. *See* Letter of Herbert F. Schwartz, Feb. 3, 2000. Subsequently, Roxane argued in a letter that this indefinite delay obviates the element of irreparable harm. *See* Letter of John F. Sweeney, Feb. 23, 2000. However, Roxane's argument must be rejected.

First, the federal patent statute clarifies that the very act of submitting a New Drug Application constitutes an act of infringement, if the manufacture and sale of the drug for which the application is submitted would itself infringe the patent. *See* 35 U.S.C. § 271(e)(2) ("It shall be an act of infringement to submit—(A) an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent. . . ."); *accord Merck & Co. v. Mylan Pharms., Inc.,* 190 F.3d 1335, 1337 & n. 2 (Fed.Cir.1999). Accordingly, Purdue's statutory right to exclude is no less threatened by the absence of actual sales of Roxicodone SR, and the presumption of irreparable harm continues to apply.

Second, there is no evidence that Roxane intends to withdraw its New Drug Application or otherwise to abandon its plans to market Roxicodone SR. Moreover, Roxane has presented no evidence to suggest that Purdue will not suffer irreparable harm from the infringement occasioned by the pendency of the New Drug Application. Therefore, the element of irreparable harm has not been obviated.

Accordingly, this Court concludes that the presumption of irreparable harm, in conjunction with the proof presented by Purdue, demonstrates that this factor weighs in favor of granting a preliminary injunction.

## IV.   Balance of Hardships

The third factor to be considered on a motion for a preliminary injunction is whether the balance of hardships tips in favor of one party or the other. *See Hybritech,* 849 F.2d at 1457. In evaluating this factor, "[t]he district court must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." *Id.* at 1457. In the present case, this Court find that three

considerations tip this balance in Purdue's favor. First, Purdue has demonstrated it will suffer irreparable harm in the absence of a preliminary injunction owing to the permanent effects that price erosion will have on its advantageous position in the analgesics market. Roxane, by contrast, has not yet introduced Roxicodone SR into the analgesics market, and regardless of what other losses it may suffer, *see generally* Swartz Decl., its potential loss of market position in the event of a preliminary injunction is unlikely to be comparable. *See Illinois Tool Works, Inc.,* 906 F.2d at 683. Second, Purdue has spent over $240 million developing and marketing OxyContin, *see* Goldenheim Decl. ¶¶ 28; Friedman Decl. ¶ 33, whereas Roxane has spent only [REDACTED] developing and marketing Roxicodone SR, *see* Schobelock Decl. ¶ 6; Swartz Decl. ¶¶ 9–10. And third, OxyContin is projected to produce 79% of Purdue's total sales revenues for the year 2000, *see* Friedman Decl. ¶ 83, whereas Roxicodone SR is projected to produce only [REDACTED] of the total sales revenues for the year 2000 for Roxane Laboratories, Inc., at least as of the time of the hearing in this action, *see* Swartz Decl. ¶ 12. *Cf. Bell & Howell Document Management Prods. Co. v. Altek Sys.,* 132 F.3d 701, 708 (Fed.Cir.1997). Accordingly, this Court concludes that the third factor, the balance of hardships, weighs in favor of the issuance of a preliminary injunction.

## V.   Public Interest

The fourth factor to be considered on a motion for a preliminary injunction is "the impact of the injunction on the public interest." *Hybritech,* 849 F.2d at 1458. "Typically, in a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Id.* (citing *Smith Int'l. Inc.,* 718 F.2d at 1581; *Datascope Corp. v. Kontron Inc.,* 786 F.2d

398, 401 (Fed.Cir.1986)). Here, Roxane has presented no evidence contradicting Purdue's assertion, *see* Friedman Decl. 61, that Purdue has been and will be able to meet the growing demand for controlled-release oxycodone products. Roxane does argue that issuance of a public injunction will injure Roxane's ability to compete in the market and thereby to contribute to the development of new analgesic products, *see* Post–Hearing Memo at 25, but this injury is an inevitable consequence of the need to protect Purdue's exclusive patent rights. Moreover, Purdue has presented evidence that harm to patients could result from confusion of products, insofar as patients might switch between products without realizing that Roxicodone SR but not OxyContin exhibits certain potentially negative effects when taken following a full meal. *See, e.g.,* Friedman Decl. ¶ 81. Although the extent and significance of these effects were debated at the hearing on this motion, the very existence of uncertainty as to these effects suggests that a preliminary injunction would serve the public interest. Accordingly, this Court concludes that the fourth factor, the public interest, weighs in favor of the issuance of a preliminary injunction.

## CONCLUSION

This Court finds that all four of the requisite factors weigh in favor of the issuance of a preliminary injunction. Accordingly, for the reasons stated above, plaintiffs' motion for a preliminary injunction should be granted.